JoNes, Chief Judge,
delivered the opinion of the court:
This case was submitted to us on stipulated facts, and without oral argument, for our determination.
Plaintiff Barnard-Curtiss Company seeks to recover additional costs incurred as a result of flood damage occurring during the course of its performance of a construction contract with defendant.
Plaintiff contracted with the Bureau of Beelamation on November 27,1958, to construct and complete the earthwork and structures necessary for the rehabilitation of the Ver-mejo Diversion Dam, the Yermejo Canal, and the Eagle Tail Canal, all of which were located in the vicinity of Maxwell, New Mexico. Plaintiff received notice to proceed on December 12, 1958, and the work was scheduled for completion by June 15, 1955. This completion date was subsequently extended to October 22, 1955, at which time the project was actually completed and accepted by defendant.
We are, for the purposes of this suit, concerned only with that part of the work plaintiff agreed to accomplish at the Willow Creek Wasteway. This was a structure built into a large earthen dam situated at the confluence of Willow Creek and Eagle Tail Canal. The dam itself extended across the valley of Willow Creek at this site, and rose to a height of approximately 36 feet above the creek bed. The wasteway structure, built into the dam, consisted of a concrete intake located toward the mid-point in the height of the dam and a monolithic concrete pipe leading downward at an angle to a concrete outlet. The intake structure was situated some 6 or 7 feet higher in the dam than the outlet.
The passage of time had caused the reservoir formed by the dam to become so silted that, by December of 1953, the silt bed was actually higher than the intake structure of the wasteway. Consequently, plaintiff was required under the contract to remove the existing wasteway structure and build a completely new one higher in the face of the dam.
The contract documents first called for the removal of the existing wasteway by excavation. When this had been ac *106 complished, plaintiff was then required to fill in the resulting wedge with compacted earth to the extent needed so that the intake portion of the new wasteway would be several feet higher than that of the old wasteway. A new outlet was to be constructed at a level approximately 22 feet lower in the dam than the new intake, and the two structures were to be connected with precast concrete pipes.
After plaintiff had been awarded the contract, it subcontracted the work to be performed at Willow Creek. By November 29, 1954, this work had been apportioned among three different subcontractors.[1] The various subcontracts specified that the old wasteway at Willow Creek was to be removed, the excavation for the new structures completed, the precast pipe laid and the concrete for the new structures poured no later than December 31, 1954. However, at that time the only work actually accomplished at the site was the removal of the old structures, the excavation for the new structures, and the erection of an earthen dike in front of the earthen dam for the purpose of protecting the opening in the latter created by the excavation.
All work apparently ceased at Willow Creek on December 31, 1954, and was not resumed until sometime in April of 1955. Thus, concrete was not poured for the new structures, nor was the precast concrete pipe laid, until May 15 or 16, 1955. The excavated opening in the earthen dam therefore still existed at this time.
On May 17-18,1955, an unprecedented and unforeseeable amount of rain[2] fell in the watershed covered by the Yerme]' o project. As a direct result of this, a large amount of water from the Willow Creek watershed flowed into the site of the wasteway structure, overtopped the protective dike and flowed through the excavated opening in the earthen dam, thereby eroding a large part of the dam. Thereafter, plaintiff was directed by appropriate Government personnel to repair the flood damage and to continue with its performance of the contract. On June 22, 1955, plaintiff notified the Bureau of Declamation that it would complete the Willow *107 Creek work, but protested the requirement of rehabilitating the construction site without additional compensation.
Eepair of the flood damage at Willow Creek was in fact accomplished by plaintiff. It was first necessary to recover the concrete pipe which had been buried in silt. Then the side banks of the excavation had to be re-sloped to prevent cave-ins and to provide a solid base for backfill. The eroded area of the dam was then replaced back to the elevation upon which the intake and outlet structures were required to be set. The total amount of fill needed to build up the eroded area as indicated was 5,250 cubic yards, and it is the cost of this item of the repair work that is here in issue.
On January 6, 1956, after the project had been completed and accepted, plaintiff executed a document releasing defendant from all but certain specified claims it might have under this contract. One of the exceptions related to the cost of repairing the damage wrought by the flood of May 17-18, 1955. Also made an exception to the release was a claim for certain dewatering work performed at the Eagle Tail Headworks by one of plaintiff’s subcontractors.
On March 22, 1956, plaintiff furnished the contracting officer with data in support of its claim for the cost of repairing the flood damage at Willow Creek and the dewatering work performed at the Eagle Tail Headworks. The contracting officer sustained the claim, in the amount of $719.55, as to the latter work, but denied the claim as to the former on the ground that this item constituted costs for which plaintiff was responsible under Article 10 of the contract.[3]
Plaintiff appealed this determination by the contracting officer to the Interior Board of Contract Appeals. The Board, after finding that plaintiff was in no way responsible for the erosion of the dam, held that it was entitled to reimbursement for a part of the costs incurred in replacing the eroded area. That is, of the 5,250 cubic yards of earth needed to rebuild the eroded area, 1,530 cubic yards were found to have been physically placed by plaintiff in a part of the dam which remained defendant’s responsibility under the contract. However, reimbursement was disallowed for the replacement of earth in the remainder of the eroded area *108 (amounting to 3,720 cubic yards) on the ground that this part of the dam was plaintiff’s responsibility under the contract since it was reasonably necessary to form the foundation or support for the new structures plaintiff was to build into the dam. The Board further found that $2.20 per cubic yard, plus an allowance of 10 percent for superintendence, general expense and profit, was a reasonable payment for the 1,530 cubic yards of earth plaintiff put into the eroded area in behalf of defendant. The pertinent parts of the Board’s decision are set forth in findings 24 and 27.
Insofar as this suit is concerned, the parties agree that all of the 5,250 cubic yards of earth required to build up the eroded area of the dam were placed by plaintiff in areas beyond the “neat or pay lines” shown on the contract drawings. These lines represented the boundaries for the excavation and fill necessary for the construction of the new wasteway structures, and constituted the limits for which plaintiff would be paid under the contract for this item of work.[4] The parties further agree that 3,720 cubic yards of replacement earth were necessary as a base or foundation to support the new wasteway structures required by the contract, while the remaining 1,530 cubic yards were not so needed. However, the latter quantity was necessary to fill in completely the remainder of the eroded area. Finally, the parties agree that the amount of recovery specified by the Interior Board of Contract Appeals is proper for any fill held to have been the responsibility of defendant under the contract.
Plaintiff takes the same position herein as it did before the Board. That is to say, it claims entitlement to payment for the entire cost of replacing the eroded area of the dam because its responsibility for the dam was limited to that portion located within the “neat or pay lines” shown on the contract drawings. Hence, defendant was responsible for the remaining parts of the dam; i.e., the parts that were actually eroded. Plaintiff argues from this premise that the general principle of law relating to the impossibility of performing contractual obligations should be applicable. Specifically, plaintiff sees this case as analogous to the so-called *109 “painting cases,” wherein a painter contracts to paint a house and, before his contract is completed, the house is destroyed through no fault of his own. According to plaintiff, it is universally held that the painter not only does not have to rebuild the house in order to complete his painting contract, but that he is entitled to remuneration for the work accomplished up to the time the house was destroyed.
Defendant, however, urges that this case is not one involving the doctrine of impossibility of performance. Eather, says defendant, plaintiff agreed under Article 10 of the contract and paragraph A-23 of the Bureau of Kecla-mation’s “Standard Specifications for Construction of Canal Systems, August 1951” [5] to deliver the work undamaged and to perform the work in such manner that no damage would result to public or private interests. Thus, defendant contends that plaintiff was responsible for the entire dam during the life of the contract. Invoking the general principle of law that neither party to a contract is responsible to the other for additional costs occasioned by an act of God, defendant would have us hold that plaintiff was required to bear the entire cost of replacing the eroded area since the erosion took place in plaintiff’s sphere of responsibility.
We cannot agree with plaintiff that the doctrine of impossibility of performance is applicable to this case. On the contrary, it appears to us that the situation here involved is one where performance of the contract was merely rendered more difficult and expensive because of an act of God than was originally anticipated. A comparison of findings 15 and 16 makes clear that the events of May 17-18, 1955, may be characterized as an act of God. Moreover, plaintiff’s performance was not rendered impossible by these events. It was required, essentially, to build concrete structures on an earthen foundation, the proper level of which was to be reached by excavating in an earthen dam. After the flood had occurred, plaintiff was still able to perform, albeit with more difficulty and expense, by replacing the eroded foundation and then building the structures in accordance with the requirements of the contract. It is well established, of course, that supervening circumstances making, the performance of *110 a promise more difficult and expensive than originally anticipated is not enough to excuse the promisor. Restatement, Contracts, § 467 (1932).
Thus, it appears to us that the basic issue in this case reduces itself to a determination of which party to this contract must bear the increased costs occasioned by the act of God. This, in turn, depends upon which party was responsible for those parts of the dam lying outside the “neat or pay lines” of the contract drawings at the relevant time.
In resolving this issue, we reject plaintiff’s assertion that it was responsible for only the area encompassed within the “neat or pay lines” during the life of the contract. It is true, of course, that the specifications provided that measurement for payment for the excavation would extend only to those lines. These provisions, however, merely relate to the amount to be paid plaintiff for excavating. They do not in terms purport to serve as a contractual limitation of responsibility, nor do we feel justified in giving such an effect to them by implication. Given the nature of the work to be performed by plaintiff, it is apparent that its activities would have a direct, and potentially adverse, effect upon parts of the dam beyond those lines. Plaintiff was not working in a vacuum. In fact, it was just those parts of the dam which were to provide the requisite foundation and support for the structures plaintiff contracted to erect. In view of this, it would seem reasonable to expect that, had the parties intended plaintiff’s responsibility to be so limited, they would have said so explicitly.
Similarly, we cannot accept defendant’s assertion that plaintiff was responsible for the entire dam during the life of the contract. Again, had the parties so intended, they would have expressed their intention in clear and unmistakable language. The provisions relied upon by defendant in support of its position speak in terms of “the work” to be performed. It by no means follows that this concept, without more, is so broad as to charge plaintiff with responsibility for the entire dam, including those parts having no direct relationship to, or bearing upon, that which plaintiff undertook to accomplish.
*111 In view of the foregoing, we conclude that plaintiff’s responsibility for the dam extended somewhat beyond the area delineated by the “neat or pay lines,” but not to the entire area. Consequently, it is our opinion, and we so hold, that the decision of the Interior Board of Contract Appeals was entirely proper. Charging plaintiff with responsibility over those parts of the dam having a direct relationship to its work, and no more, is the most reasonable determination that can be made in the circumstances. The contract documents do not compel a contrary conclusion, nor do we feel constrained to reach a different result on the record before us. Therefore, plaintiff is entitled to recover the amount specified by the Interior Board of Contract Appeals, or $3,702.60 (1,530X$2.20, plus 10 percent).
One other matter remains for our consideration. We have previously stated that the contracting officer also found that plaintiff was entitled to recover the amount of $719.55 for certain dewatering work accomplished by one of its subcontractors at the Eagle Tail Headworks. Plaintiff’s petition herein also includes a demand for this payment.
Defendant now contends that plaintiff is not entitled to this sum on behalf of its subcontractor because the latter released plaintiff from any liability in respect to it in a document executed on June 19, 1959. The relevant language of that release reads as follows:
It is expressly understood that, as between Barnard-Curtiss Company and Ace Construction Company [the subcontractor], the former is prosecuting in behalf of the latter and against the United States government a claim for work done by Ace Construction Company on the Vermejo project at Maxwell, New Mexico. Any amount which Barnard-Curtiss Company receives from the government with respect to Ace Construction Company’s claim is excepted from this release, and Barnard-Curtiss Company agrees to forward such sums it may collect when received.
In order to recover this amount from defendant in this suit in behalf of its subcontractor, plaintiff must first show that it is liable to the subcontractor for the amount. Defendant asserts that the language quoted above precludes such a showing.
*112 We do not agree. This language is substantially the same as the “as and when” clause sustained by this court against a similar attack by defendant in Donovan Construction Co., et al. v. United States, 138 Ct. Cl. 97. Consequently, we hold that plaintiff may recover, in addition to the amount stated above, the sum of $719.55 in behalf of its subcontractor for the dewatering work performed at the Eagle Tail Headworks.
Plaintiff is entitled to recover in the amount of $1,422.15 ($3,702.60 plus $719.55) and judgment will be entered to that effect.
It is so ordered.
Dureee, Judge; LaraiioRe, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the stipulation of the parties, and the briefs and argument of counsel, makes findings of fact as follows:
1. On November 27, 1953, the plaintiff, Barnard-Curtiss Company, entered into Contract No. 14-06-D-715 with the defendant, as represented by the Bureau of Beclamation. This contract was for the earthwork and structures for rehabilitation of Vermejo Diversion Dam, Vermejo Canal, and Eagle Tail Canal located in the vicinity of Maxwell, New Mexico.
2. The contract as executed contained the following pertinent articles, specifications and drawings:

Contract Articles

article l. Statement of work. — The contractor shall furnish the materials, and perform the work for construction and completion of the earthwork and structures, utilizing precast-concrete pipe in siphons and wasteways, for the rehabilitation of the Vermejo Diversion Dam, Vermejo Canal, and Eagle Tail Canal, under Schedule No. 2 of Specification No. DC-4035, Vermejo Project, New Mexico, for the consideration of payments to be made to the contractor at the unit and lump sum prices stated in said schedule in strict accordance with the specifications, and drawings, all of which are made a part hereof and designated as follows: Specifications No. DC-4035, its Supplemental Notices *113 Nos. 1, 2, 3, 4, and 6, dated October 9, 14 and 20, and November 3 and 9, 1953, respectively, and the Bureau of Reclamation’s “Standard Specifications for Construction of Canal Systems, August 1951.”
The work shall be commenced * * * and shall be completed as provided in paragraph 6 of Specifications No. DC-4035, as modified by said Supplemental Notice No. 1.
$ ‡ $
article io. Permits and responsibility for work. — ■ The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.
* $ ❖ , * %
STANDARD SPECIFICATIONS FOR CONSTRUCTION OF CANAL SYSTEMS AUGUST 1951
$ ‡ $
A-9. Extras. * * * Extra work and material will ordinarily be paid for at the lump-sum or unit price stated in the order. Whenever, in the judgment of the contracting officer, it is impracticable, because of the nature of the work or for any other reason to otherwise fix the price in the order, the extra work and material shall be paid for at the actual necessary cost as determined by the contracting officer, plus an allowance, not to exceed 10 percent of such actual necessary cost of the extra work and materials, for superintendence, general expense, and profit. * * *
*****
A-23. Construction at existing canal, farm-ditch, pipe line, and natural-drainage crossings. Where the work to be performed under these specifications crosses or otherwise interferes with existing streams, watercourses, canals, farm ditches, oil, gas, or water pipe lines, drainage channels, or water supplies, the contractor shall provide for such watercourses or pipe lines and shall perform such construction during the progress of the work that no damage will result to either public or private interests, and the contractor shall be liable for all damage that may result from failure to so provide *114 during the progress of the work. The cost of such work shall be included in the unit prices bid in the schedule for excavation. Where new structures or modifications of existing structures to render the watercourses or pipe lines operative beyond the period of the contract are required at these crossings, as shown on the drawings or as directed by the contracting officer, payment will be made at the prices bid in the schedule for the required items of work: Provided, That where such items of work are not provided for in the schedule, the contractor shall perform the necessary construction as extra work
$ $ $ í $
B-7. Excavation for structures, (a). Measurement for payment. — Excavation for structures will be measured for payment to excavation pay lines shown on the drawings or if not shown on the drawings, to lines and dimensions staked out by the contracting officer in accordance with the following provisions:
*****
(7) Excavation for the foundation of structures shall be to the elevations shown on the drawings or established by the contracting officer. Where concrete is to be placed directly upon or against rock, the excavation shall be sufficient to provide for the minimum thickness of concrete at all points, and this thickness shall be exceeded as little as possible.
(b) Surfaces of excavation. — The contractor shall prepare the foundations at structure sites by methods which will provide firm foundations for the concrete structures. The bottom and side slopes of common excavation, upon or against which concrete is to be placed, shall be finished by hand to the prescribed dimensions, and the surfaces so prepared shall be moistened and tamped with suitable tools for the purpose of thoroughly compacting them and forming firm foundations upon or against which to place the concrete structures.
If at any point in common excavation the foundation material is excavated beyond the lines required to receive the structure, the over-excavation shall be filled with selected materials and compacted in accordance with the requirements of Paragraph B-14. If at any point in common excavation, the natural foundation material is disturbed or loosened during the excavation process or otherwise, it shall be consolidated to a degree satisfactory to the contracting officer, or where directed, it shall be removed and replaced with selected material and compacted in accordance with the requirements of Paragraph B-14. Any and all excess excavation or over- *115 excavation performed by the contractor for any purpose or reason, except as may be ordered in writing by the contracting officer, and whether or not dne to the fault of the contractor, shall be at the expense of the contractor. Fill and compacting of fill for such excess excavation or overexcavation shall be at the expense of the contractor * * *.
(c) Payment. — Insofar as practicable, the material moved in excavation for structures shall be used for backfill and embankments or shall be wasted as directed by the contracting officer. Payment for excavation for structures will be made at the unit prices per cubic yard bid therefor in the schedule. The unit prices bid in the schedule for excavation for structures shall include the cost of all labor and materials for cofferdams and other temporary construction, and of all pumping and un-watering, and all other work necessary to maintain the excavations in good order during construction, and of removing such temporary construction, where required, and shall include the cost of disposal of the excavated material, except that required overhaul will be paid for as provided in Paragraph B-17.
Specifications No. DC-4035
SPECIAL PROVISIONS
* * * * *
2. The requirement. It is required that there be constructed and completed in accordance with the Special Provisions herein, the Standard Specifications and the drawings listed in Paragraph 91 hereof, the earthwork and structures for the rehabilitation of Yerme jo Diversion Dam, Vermejo Canal, and Eagle Tail Canal, Ver-mejo Project, New Mexico.
% ❖ # * Hi
_ 32. Construction at existing eanal, farm-ditch, pipeline, and natural-drainage crossings. In accordance with Paragraph A-23 [Standard Specifications for Construction of Canal Systems, August 1951], except that after the sentence ending in line 21, the following is inserted: “The contractor’s operations shall not interfere with the normal water requirements for irrigation or storage operations on the existing project during the irrigation season which extends from April 1 to October 1.”
*****
44. Excavation for structures. The item in the schedule for excavating for structures includes the following excavation: Siphons with blow-off; bifurcation struc *116 ture and chute, except trapezoidal section as provided in Paragraph 75; check; drop; wasteways; Eagle Tail Canal headworks structure; jetty anchors; the excavation for placing riprap protection as provided in Paragraph 41; and the excavation for the removal of the existing concrete boxes at the location of the Willow Creek and Curtis Creek wasteways.
48. Bacl&fill about structures, (a) * * *
(b) * * *
(c) Measurement and payment. — Fill or excavation refill required to be placed about structures that is within the pay line limits for excavation for the structures will be measured in place for payment as backfill about structures. Except as provided in Subparagraph (b), fill about the structures above the original ground surface that cannot be placed until the structures are completed and fill about structures above the original ground surface within the slopes and limits of excavation pay lines for such structures as extended to intersect the finished grades and/or surfaces of adjacent earthwork will be measured in place for payment as batíkfill about structures : Provided, That above the original ground surface the excavation pay lines will be extended to intersect the finished grades and/or surfaces at slopes not less than 1 to 1. Measurement, for payment, of backfill about structures will be made only for the quantities actually placed within the limits of the established pay lines.
Payment for backfill about structures will be made at the unit price per cubic yard bid therefor in the schedule, which unit price shall include the cost of all work connected therewith, including the excavation and haul of the necessary material: Provided, That material from required excavation used for backfill about structures will be paid for both as excavation when removed from original position and as backfill when placed. Where additional material is obtained from approved borrow pits and used for backfill about structures, payment will be made for backfill only, and the costs of excavating and hauling of such material shall be included in the unit price bid in the schedule for backfill about structures. Eefi.ll of excavation performed outside of the established pay lines for excavation for structures shall be placed in the same manner as specified for the adjacent backfill, and such refill shall be placed at the expense of the contractor.
*117 59. Removal of existing facilities, (a) List of facilities or materials. — The contractor shall remove the following facilities or materials from the existing diversion dam and canals:
(1) * * *
/gj * # *
)g\ * * *
* * *
(5) Two 3- by 3-foot reinforced concrete sluice boxes with a total length of approximately 250 feet at the location of the Willow Creek and Curtiss Creek Wasteways.
(6) Two steel slide gates at the entrance to the Willow Creek and Curtiss Creek sluiceway boxes; 3 steel slide gates in the Verme jo diversion dam; and 9 wooden slide
gates in the Vermejo diversion dam, headwork structure. * * *
(b) General. — The removal of existing facilities shall be performed in such a manner, and at such times as to permit normal irrigation operations as provided in Paragraph 32. * * * The manner of removing existing concrete from the canal lining and wasteway boxes will be at the contractor’s option except that blasting will not be permitted for removal of canal lining and that earth foundations or surfaces to become a part of the finished construction shall not be disturbed.
ífc
3. Notice to proceed with the work was received by the contractor on December 12,1953. In accordance with paragraph 6 of Specification No. DC-4035, the final date for completion of the work was fixed at 550 days — thereafter, or June 15, 1955. The work was completed and accepted on October 22,1955 — the final date for completion having been extended to this date.
4. The portion of the work performed under this contract relevant to the subject litigation was that to be accomplished at Willow Creek Wasteway — an isolated wasteway structure located in an earthen dam at the confluence of Willow Creek and Eagle Tail Canal. This earthen dam extended across the valley of Willow Creek at this site and rose to a height of about 36 feet above the bed of Willow Creek. The contract required removal of the existing wasteway structure which consisted of a concrete intake structure situated toward the midpoint in the height of the earthen dam, together with a *118 monolithic concrete pipe leading downwards to a concrete outlet structure. The elevation of the old intake structure was approximately 6 or 7 feet higher than the old outlet structure. The passage of time had caused the reservoir formed by this dam to silt in so that in December 1953 the Eagle Tail Canal traversed this silt bed by means of a small channel. The level of the silt bed at the intake of the old concrete wasteway was slightly higher than the intake itself.
5. After removal of the old wasteway structure at Willow Creek the contract required filling in with compacted earth at the intake end of the structure so that the elevation of the intake portion of the new structure would be several feet higher than the elevation of the intake of the old structure. A new outlet structure was to be constructed at a level approximately 22 feet lower than the new intake structure with the connection between the two structures to consist of precast concrete pipes — all in accordance with Drawing 455-D-43 of Specification DC-4035.
6. Drawing 455-D-43 contained the following note:
* * * Place entire structure on undisturbed earth or compacted backfill. * * *
and listed the specific elevations for the inlet and outlet structures.
7. On January 8,1954, plaintiff entered into a subcontract with D. W. Falls Construction Co. containing the following provisions:
I. To furnish all labor, material, skill and instru-mentalities; to secure all field measurements necessary or required, and to perform all the work necessary or incidentally required for that part of the construction of the aforesaid project, as follows: (Describe sub-contract work here together with any special conditions applying to this agreement.)
All those parts of the construction of the aforesaid project specifically listed and referred to in Paragraph XXII hereto and by this reference made a part of this Agreement.

# % % % %

III. To begin the work herewith contracted for as soon as the project upon which the work is to be done is ready for such work or within ten calendar days after being notified in writing by the Contractor so to do, and *119 to complete the several portions of the whole thereof within the time or times following, namely: all of the work to be completed on or before December 31, 1954.
•I* •!' H*
XXII. The work to be performed by the Sub-Contractor shall consist of all the following items or parts of items as specified in the Supplemental Notice No. 3, Bidding Schedules for Specifications No. DC-4035; $ $ $
* * # * #
3. All that part of Item No. 43, excavation for structures, consisting of excavation for the following concrete structures:
•J» «{» sfs •]• $
Willow Creek wasteway inlet and outlet only
$ ‡ ‡
Estimated 9,000 cubic yards at $1.50 per cubic yard. H* ‡
5. All that part of Item No. 45, compacting embankments, consisting of compacting the embankments for all the concrete structures specifically listed under Paragraph 3 above. Estimated 1,000 cubic yards at $.35 per cubic yard. 350.00*
6. All that part of Item No. 46, back fill about structures, consisting of all the back fill about the concrete structures particularly mentioned in Paragraph 3 above. Estimated at 1,500 cubic yards at $.35 per cubic yard. 540.00*
7. All that part of Item No. 47, compacting back fill about structures, consisting of the compacting of back fill about all the concrete structures hereinabove mentioned in Paragraph 3 hereof. Estimated at 500 cubic yards at $3.00 per cubic yard. 1500.00*
11. All of Item No. 54, concrete in structures. Estimated 970 cubic yards at $65.00 per cubic yard. 63050.00*
8.On June 7, 1954, D. W. Falls Construction Company entered into a sub-subcontract with the Ace Construction Company which contained the following terms:
I. To furnish all labor, material, skill and instru-mentalities, to secure all field measurements necessary *120 or required, and to perform all tbe work necessary, or incidentally required for that part of the construction of the aforesaid pro]'ect, as follows:.
All those parts of the construction of the aforesaid project specifically listed and referred to in Paragraph XXII hereto and by this reference made a part of this Agreement.
í{i í£ ft V
TTT. Work is to begin under this contract June 14, 1954, and work is to be scheduled in such a manner as to attempt to complete all items by December 12, 1954. Provided work is not completed by this time, then the terms and general conditions of the general contract shall prevail.
Í* $
XXII. The work to be performed by the Sub-Contractor shall consist of all of the following items or parts of items as specified in all Supplemental Notices, Bidding Schedules for Specifications No. DC-4050;
Item 13. Concrete in Structures — 1000 C. Y. at $66.50 per cubic yard.
Item 14. Furnish and handle type Y cement — 1200 barrels at $8.87 per BB1.
Item 15. Beinfoi’cing steel — 80,000 pounds at $0.1425 per pound.
Item 16. Untreated timber in structures — 27 M.b.m. at $261.25 M.b.m.
Item 17. Treated timber in structures — 8 M.b.m. at $332.50 M.b.m.
Item 18. Untreated stop planks — 3 M.b.m. at $285.00 M.b.m.
Item 30. Metal Slide Gates — 14,000 pounds at $0.64 per pound.
Item 31. Miscellaneous metal — 7000 pounds at $0.64 per pound.
9. On November 29, 1954, plaintiff entered into a subcontract with C. E. Caldwell whereby Caldwell agreed:
I. To furnish all labor, material, skill and instru-mentalities, to secure all field measurements necessary or required, and to perform all the work necessary or incidentally required for that part of the construction of the aforesaid project as follows:
* * ❖ ' * ❖
All the parts of the construction of the Willow Creek Wasteway from end to end of the precast concrete pipe and for riprap as follows:
*121 Item No. 43— OuUo yard
Excavation for structures at $1.00 per c.y.
Item No. 46—
Back Fill Structure at .25 per c.y.
Item No. 47-
Compacting Back fill at 3.00 per c.y.
Item No. 61—
Lay 42" Concrete Pipe with copper joints at 5.00 per Ln. ft.
Item No. 48—
Laying Bip Bap at 1.50 per c.y.
Item No. 49—
Place gravel bed for Bip Bap at 2.00 per c.y.
Item No. —•
Extend Channel Exc. to daylight downstream and slope bottom to meet canal invert upstream at 200 per cubic yard.
❖ ❖ * ‡ *
III. To begin the work herewith contracted for as soon as the project upon which the work is to be done is ready for such work or within 10 calendar days after being notified in writing by the Contractor so to do, and to complete the several portions of the whole thereof within the time or times following, namely:
Item No. 43 and Item No. 61 on or before December 31, 1954.
Item No. 46, No. 47, No. 48, No. 49 on or before March first 1955.
Channel exc on or before March first, 1955.
10. In summary, after November 29, 1954, responsibility for the work at Willow Creek Wasteway was divided as follows:
1. C. E. Caldwell — subcontractor with plaintiff.
(a) Excavation to remove old structure and removal of old structure
(b) Place compacted backfill for foundation of pipe portion of new structure
(c) Place precast concrete pipe
2. D. W. Falls Const. Co. — subcontractor with plaintiff
(a) Concrete in structures (except precast pipe)
(b) Structure excavation and backfill related to concrete portions of the structures.
*122 3. Ace Construction Co. — subcontractor Avith D. W. Falls Const. Co.
(a) Concrete in structures.
The various subcontracts and sub-subcontracts specified that the old structure at Willow Creek was to be removed, the excavation for the new structures completed, the precast concrete pipe laid, and the concrete for the new structures poured by at least December 31, 1954
11. C. E. Caldwell commenced work at Willow Creek in December 1954. He first removed the old wasteway consisting of the inlet and outlet structures including the monolithic structure in between. He then filled in with compacted earth some of the area at the intake end which had been occupied by the old intake structure so that the elevation was raised to that required for the base of the new intake structure. The spoils from excavation were placed between the canal and the area prepared for the new wasteway structure to form a dike to protect the opening in the earthen dam. The spoils used to make the protective dike were originally placed in uneven piles but were subsequently dozed over by the Conservation District to form an access road to replace one breached by the plaintiff in the process of preparing the wasteway site. The resulting even-topped dike thus formed was in no place lower than the low points in the previous uneven spoil pile dam but was some 4-5 feet below the level of the original earthen dam. A Government inspector was intermittently present at the site during construction operations. Subsequent to the dozing of the spoil piles the contractor did not raise the dike to the height of the dam nor did the Government suggest or direct that this be done.
12. By the end of December 31, 1954, the only work accomplished at Willow Creek was the removal of the old structures, the excavation for the new structures and the resulting erection of a protective dike in front of the excavation. If the work at Willow Creek had been prosecuted continuously it would have taken from three weeks to one month to complete. Mr. J. A. Barnard, plaintiff’s president, testified before the U.S. District Court for the District of New Mexico that pipe was not laid in January of 1955 because “you leave it there, it might get knocked out” by “floods.”
*123 13. Approximately 80 percent of the rainfall in the area of New Mexico in which the work under Contract No. 14-06-D-715 was prosecuted falls between the months of April and October. This is the so-called “rainy season.” It was plaintiff’s intention that the Willow Creek Wasteway structure be completed prior to the beginning of this rainy season. It was the opinion of the Government’s expert witness before the Interior Board of Contract Appeals that the location of the structure site coupled with the difference in grade level between the inlet and outlet areas made the site particularly subject to possible damage in the event of high water flow.
14. Work at Willow Creek was resumed toward the end of April, 1955. No additional flood protection to the site was provided. Until the precast concrete pipe was laid it was not feasible to commence construction of the inlet and outlet structures. The precast concrete pipe was laid by C. E. Caldwell on the 15th or 16th of May, 1955. Ace Construction Company then moved in and poured the slab for the floor of the outlet structure and set up forms for the rest of the concrete.
15. On May 17-18, 1955, an unprecedented amount of rainfall fell in the watershed covered by the Yermejo project. The daily precipitation (in inches) for the period May 17-20, 1955 for various points adjacent to this area is as follows:

16.The normal precipitation for the months of March, April, May, and June for these points is as follows:

*124 17. As a result of the unprecedented rainfall, a large amount of water from the Willow Creek watershed flowed into the site of the wasteway construction. The peak flow at Willow Creek approximated 2,300 second feet of water. The water overtopped the protective dike and flowed through the excavation at the construction site and on into the Canadian Biver beyond. On Friday, May 20,1955, a Government inspector reported as follows:
* :¡: * * $
Checked the Willow Creek waste-way and head-works to-day. At Willow Creek the damage is severe. The eight POP [Precast concrete pipe] that were set are gone along with steel for collars and forms for structures. Wash-out here is at lease [sic] fifty feet deep. All water flowing down Eagletail Canal gomg through wash-out to Canadian Biver at this point.
The flow of water eroded 5,250 cubic yards of earth from the wasteway site. While neither the Government nor plaintiff anticipated a flood of the severity which occurred, it was the undisputed opinion of the Government’s expert witness before the Interior Board of Contract Appeals that if a flood of the magnitude experienced during the period May 17-20 had occurred either before construction operations were commenced by the plaintiff at the Willow Creek Waste-way site, or after the Willow Creek Wasteway structure had been completed, the existing spillway areas above and below the construction site would have easily accommodated the peak flow possible because of the rainfall during May 17-20 and there would have been no damage at the site.
18. On June 22, 1955, after a previous conference with Government personnel at which time plaintiff was directed to continue performance of Contract No. 1J-06-D-715, plaintiff wrote the following letter to the Bureau of Beclamation:
BaRNARd-Cuetiss Company,
June 22,1955.
Bureau op Beclamation
c/o Mr. La Verne H. Lincoln, Project Engineer
Maxwell, New Mexico
Gentlemen:
This letter is to notify you that Barnard-Curtiss Company intends to complete its contract on the Vermejo *125 Project as expeditiously as due diligence and economic feasibility will permit, despite tbe recent damaging rainstorm.
Certain parts of the work need merely be done according to the letter of the contract, but those parts which were damaged from the rainstorm will be rehabilitated in accordance with the suggestions outlined in a conference held between Mr. Bloodgood, Mr. Powell, Mr. Lewis, Mr. Lincoln and the undersigned on June 14, 1955, at Maxwell, New Mexico, in the Bureau offices. These specifications are understood as outlined at this meeting, and no written detail thereof need be made.
You are advised, however, that Barnard-Curtiss Company is protesting the necessity of its doing this rehabilitation work, particularly on the Curtiss Creek structure and on the willow Creek structure, without additional compensation, for the reason that the rainstorm of May 17-20, 1955, materially changed the conditions under which the work was to be done. The damage done by this rainstorm was a result of plans made, work done and conditions existing outside the contemplation of our contract.
¡Very truly yours,
BARNARD-OURTISS company
By (8) J. A. Barnard, Pres.
19. On July 5,1955, plaintiff wrote a letter to D. W. Falls Construction Co., Inc. as follows — in pertinent part:
As stated in the beginning of this letter, it is the position of Barnard-Curtiss Company that all damage caused by the flood of May 18th is your responsibility. It is up to you to proceed with the construction of the Willow Creek Wasteway commencing with the situation as it now exists. Even though you may not concur in the view, you 'have work to do at Willow Creek and you are directed to proceed with it within five (5) days.
We wish to call your attention to the fact that another flash flood can occur at any time which might cause more severe damage than was caused by the flood of May 18th.
Another reason why there can be no further delay is contained in the attached letter received today from the Bureau of Reclamation extending the time of completion of the contract to August 31, 1955. If you are to complete by that time, it will be necessary for you and your sub-contractors to immediately increase the number of employees. It is obvious to you that any penalty assessed by the Bureau will have to be paid by you.
*126 20. Repair of the flood damage at Willow Creek Wasteway was performed by the plaintiff. It was necessary to recover the concrete pipe which had been bnried in silt. Then the side banks of the excavation were re-sloped to prevent cave-ins and to provide a solid base for backfill. The eroded area was then replaced back to the elevation upon which the structures and concrete pipe were to be placed. The total amount of fill placed to build up the eroded area was 5,250 cubic yards.
21. All contract work was completed and accepted by the Bureau of Reclamation on October 22, 1955 — 52 days after the date then set for final completion. On January 6, 1956, the plaintiff executed a document whereby it “* * * remises, releases, and forever discharges the United States of and from all manner of debts, dues, sum or sums of money, accounts, claims, and demands whatsoever, in law and in equity, under or by virtue of the said contract, except as to exceptions attached.” Among the “exceptions attached” relevant to the instant litigation was a claim for “Cost of repairing flood damage of May 18, 1955 caused by excessive rainfall and ditching or change of alignment of canal ahead of the wasteway resulting in ‘Changed Conditions’ as contemplated by the contract.” Also listed as an exception was a claim for certain dewatering work performed at the Eagle Tail Headworks by the Ace Construction Co., and for which Ace Construction Co. had demanded payment from plaintiff.
22. By a letter, dated March 22, 1956, the plaintiff furnished data to support its claims. By findings of fact, dated July 3, 1956, the contracting officer issued his decision on plaintiff’s claim here relevant. The findings state in pertinent part:
EAGLE TAIL HEADWORKS
•{• «i® «í» *?•
12. The contractor did not work on July 3 or 4, but allowed the water to rise inside and outside the stilling basin walls. The contractor was instructed on July 6 to completely unwater the stilling basin so that a thorough inspection could be made for flood damage, particularly at the point of intersection of the walls with the floor. The contractor resumed pumping on July 7 and continued through July 11, when heavy run-off intercepted by Eagle Tail Canal again inundated the stilling *127 basin section of the structure, as well as the contractor’s pumps. The pumps were removed for cleaning on July 15; and, before the contractor made any further attempts to unwater the structure, it was determined on the basis of information gained during the period July 7-11 that no repairs to the structure would be required. It has been determined from the project records that the total cost to the contractor of the unwatering discussed in this paragraph was $719.55, as shown in the breakdown attached as Exhibit 6.

Decision

13. After careful consideration of the facts and circumstances pertaining to this item of claim, it is the conclusion of the contracting officer that the conditions offered as the basis thereof did not constitute “changed conditions” within the meaning of Article 4 of the contract; that, pursuant to Article 6(c) of the contract, the contractor is entitled to payment of that part of this item of claim discussed in Paragraph 12 above, in the amount of $719.55; that the remainder of this item of claim represents costs for which the contractor is responsible under Article 10 of the contract and/or costs which the contract provides shall be included in the prices for schedule items, and that there is no basis in the contract for allowance of the remainder of this item of claim. Payment of the remainder of this item of claim is therefore denied.
* * * * $
WILLOW CREEK WASTEWAY

Decision

19. After careful consideration of the facts and circumstances pertaining to this item of claim, it is the conclusion of the contracting officer that the conditions offered as the basis thereof did not constitute “changed conditions” within the meaning of Article 4 of the contract ; that this item of claim represents costs for which the contractor is responsible under Article 10 of the contract; and that there is no other basis in the contract for allowance of this item of claim. It is therefore denied.
23. By findings of fact, dated October 15, 1956, the contracting officer found that plaintiff’s delay of 52 days in completing the work under Contract No. 14 — 06-D-715 was ex *128 cusable (mainly because caused by heavy rainfall) and the time for completion was extended until October 22,1955 — the actual date of final completion. Plaintiff, therefore, was not assessed liquidated damages for delay.
24. Plaintiff appealed from the denial of its Willow Creek Wasteway claim and the appeal was heard by the Interior Board of Contract Appeals which Board issued a decision on August 9, 1957, which stated in pertinent part:
As the contractor was not negligent in the conduct of its operations at the Willow Creek wasteway, its obligation was only to restore the contract work that had been changed. However2 while the Board does not believe that the scope of this obligation was so narrow that the contractor could not be required to do any work that was outside the pay or neat lines, it was so wide that the contractor could be required to restore any property of the Government that may have been damaged by the storm.
Thus, the contractor could be required to remove any material from the excavation which had been deposited as a result of the storm, to replace any backfill which had been washed out by the storm, to restore the damaged portions of the wasteway structures, to complete those structures, and to reconstruct the segment of the dam which the contractor had excavated in order to build the wasteway. Furthermore, the contractor could be required to fill in the areas eroded by the storm to the extent that was reasonably necessary in order to provide adequate foundations or support for the wasteway structures together with the segment of the dam removed by the contractor, and to perform resloping operations or adopt other construction procedures to the extent that they were reasonably necessary in order to provide such foundations or support, for these steps would be essential to the restoration and completion of the contract work. But, so far as resloping, backfilling or other work in the eroded area are concerned, the obligation of the contractor was limited to reestablishing only so much of the former earth surfaces as would be reasonably necessary to admit of the wasteway being completed to the elevations, dimensions, and standards prescribed by the contract and to admit of the portion of the embankment removed by the contractor being replaced in like manner. *129 The obligation could not be enlarged to the point where the contractor, who was required merely to make an opening through the embankment, would be required to rebuild other portions of it, irrespective of the relationship of this work to the restoration of the area excavated by the contractor or to the completion of other features of the contract work.
25. To implement the August 9, 1957 decision of the Interior Board of Contract Appeals, the contracting officer issued, on October 28, 1957, supplemental findings of fact. The contracting officer found that the plaintiff, because of the washout, had to replace 5,250 cubic yards of fill. Of this amount it was determined that all but 1,530 cubic yards was earth surface that would be reasonably necessary to admit of the wasteway structures being completed according to contract specifications. It was determined that 1,530 cubic yards of the 5,250 replaced would not have been necessary to support the wasteway structures — this 1,530 cubic yards was placed generally as fill at the extreme sides of the erosion and was thus not directly a necessary support to the structures but was fill required to close in completely the eroded hole in the embankment. It was further found by the contracting officer that $2.20 per cubic yard plus an allowance of 10 percent for superintendence, general expense and profit was an appropriate allowance for the fill that was the responsibility of the Government under the IBCA decision — or 1,530 times $2.20 plus 10 percent, equaling a total of $3,702.60.
26. By a letter dated November 27,1957, the plaintiff appealed from the contracting officer’s decision of October 28, 1957, claiming that the decision was erroneous in that the plaintiff “* * * is entitled to extra payment for the entire 5,250 cubic yards outside of the neat or pay lines shown on the original plans,” and that the plaintiff “* * * is entitled to a unit price of $3.50 per cubic yard for the backfill necessitated by the flood * *
27. By its decision, dated January 23, 1958, the IBCA affirmed the contracting officer’s findings as follows:
*130 It is clear that in contending that it should be paid for the entire 5,250 cubic yards of backfill the contractor is merely reiterating its original position, which the Board has already rejected, for the Board has held that the extent of the contractor’s obligation to repair the storm damage is not to be measured by the location of the neat or pay lines. The contractor has seized upon the phrase “the former earth surfaces” in the Board’s definition of the extent of its obligation of repair as support for repetition of its argument in a slightly different form by contending that the Board has held that it was “the responsibility of the Government, after the flood, to rebuild the embankment up to the neat or pay lines shown on the plans,” after which it would be “the responsibility of the contractor to provide such surfaces ‘as would be reasonably necessary to admit of the wasteway being completed * * * and to admit of the portion of the embankment removed by the contractor being replaced’.” The Board made it plain, however, that it was the contractor’s obligation to fill in eroded areas to the extent reasonably necessary to restore the contract work, irrespective of the location of the neat or pay lines, and “the former earth surfaces” could hardly be restored without replacing the eroded material underneath those surfaces. The contracting officer’s understanding of that phrase conforms to the Board’s intent, whereas the interpretation which the contractor would put upon the phrase is entirely inconsistent with that intent. As for the apportionment of the responsibility for the 5,230 cubic yards of backfill, the contractor has not challenged the correctness in any particular of the contracting officer’s apportionment, and it is, therefore, accepted by the Board.
*****
The Board also affirmed the contracting officer’s finding that $2.20 a cubic yard plus 10 percent was a proper allowance. Plaintiff and defendant agree that: five thousand two hundred and fifty cubic yards of impacted fill was necessary to replace the area eroded in the earthen dam across Willow Creek as a result of the flooding through the wasteway site under construction; that all of this 5,250 *131 cubic yards of impacted fill was, accordingly, placed in areas beyond the lines shown on the contract drawings as the boundaries for the excavation and fill required for construction of the wasteway structures; of the 5,250 cubic yards so placed by plaintiff, under protest, 3,720 cubic yards was necessary as a base to support the wasteway structures required by the contract; 1,530 cubic yards of the 5,250 replaced would not have been required to support the wasteway structures, but was necessary to completely close in the eroded area; $2.20 per cubic yard plus 10 percent for superintendence, general expense and profit is the proper amount of recovery for any fill that is held to be the responsibility of the Government.
28. Pursuant to the IBCA decision, on March 4, 1958, plaintiff was tendered a voucher for $3,702.60 (Willow Creek) plus $719.55 (Eagle Tail Headworks) or a total of $4,422.15. Plaintiff declined to execute the voucher so submitted.
29. On or about May 23, 1956, D. W. Falls Construction Company and Ace Construction Company instituted suit against plaintiff in the United States District Court for the District of New Mexico. This suit, brought under the provisions of the Miller Act, 40 U.S.C. 270 et seq., was for amounts allegedly due and owing from plaintiff to the above mentioned companies as a result of their work as subcontractors on Contract No. 14-06-D-715. In particular, the claim asserted by Ace Construction Company against Barnard-Curtiss in the said District Court action included the Eagle Tail Headworks dewatering claim which is the subject of paragraph VII of plaintiff’s petition in the subject suit.
30. On or about May 29,1956, plaintiff filed a counterclaim against the said D. W. Falls Construction Co. for recovery of the amount expended in the repair of the Willow Creek Wasteway flood damage alleging that “* * * D. W. Falls Construction Co. failed and neglected to complete its work *132 required by such standard sub-contract agreement herein-above referred to, on or before December 31, 1954.”
31. In a memorandum opinion, dated July 24,1956, Judge Waldo H. Rogers stated in dismissing plaintiff’s counterclaim :
‡ ij« ‡ ^ ❖
The Court is of the opinion that the Counter Claim should be dismissed for the reason that there is lacking therein the element of legal causation between any delay in performance of the sub-contractor’s work and the flash flood. The flash flood is in the nature of an “Act of God,” was of unusual proportions, and could not have been foreseen by the parties during the making and performance of the contracts involved. The common law English case of Hadley v. Baxendale is in point in this regard. In addition to this, the Counter Claimant did not sustain its burden of proof of establishing by a preponderance of the evidence that the delays were caused by the plaintiffs.
32. Findings of fact and conclusions of law were issued by the District Court on August 3,1956, and judgment was entered on that date in favor of Falls and Ace and against plaintiff and dismissing plaintiff’s counterclaim. The matter was appealed twice to the U.S. Court of Appeals for the 10th Circuit and the decisions are reported at 244 F. 2d 565 and 257 F. 2d 565. Subsequent to the last decision of the Court of Appeals remanding the case to the District Court the parties entered into a mutual release on the following terms:
In the United States District Court
For the District of New Mexico
Civil Action No. 3139
The United States of America, for the use and benefit of D. W. Falls Construction Co., and Ace Construction Company, Plaintiffs, vs. Barnard-Curtiss Company, and The Seaboard Surety Company, Surety, Defendants.
*133 Mutual Release
Filed June 19, 1959, at Albuquerque
ffm. D. Bryars, Olerh
For and in consideration of the sum of Twenty Thousand Dollars ($20,000.00) paid by Barnard-Curtiss Com.pany for itself and The Seaboard Surety Company to D. W. Falls Construction Co. and Ace Construction Company, and for other good and valuable considerations, the receipt in sufficiency whereof is hereby confessed and acknowledged, it is expressly understood and agreed:
1. Barnard-Curtiss Company hereby releases, relinquishes and forever discharges D. W. Falls Construction Co. and Ace Construction Company from all demands, claims, rights or claims for relief of whatever nature, whether now pending or which it has had, or professed to have, against the other party arising from all and every cause whatsoever. D. W. Falls Construction Co. and Ace Construction Company hereby release, relinquish and forever discharge Barnard-Curtiss Company and The Seaboard Surety Company from all claims, demands, rights or actions of whatever nature, actual or threatened, that they have or profess to have against Barnard-Curtiss Company or the Seaboard Surety Company arising from all and every cause whatsoever.
* * * t- *
3. It is expressly understood that, as between Barnard-Curtiss Company and Ace Construction Company, the former is prosecuting in behalf of the latter and against the United States government a claim for work done by Ace Construction Company on the Vermejo project at Maxwell, New Mexico. Any amount which Barnard-Curtiss Company receives from the government with respect to Ace Construction Company’s claim is excepted from this release, and Barnard-Curtiss Company agrees to forward such sums it may collect when received.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover in the amount of four thousand four hundred twenty-two dollars and fifteen cents ($4,422.15) and judgment will be entered to that effect.

 See finding 10.

 See findings 15 and 16.

 See finding 2.

 Ibid.

 Ibid.