NICHOLAS J. MELEO et al., Individually and Doing Business as PERINTON MANOR, et al., Respondents, v ROCHESTER GAS AND ELECTRIC CORPORATION et al., Respondents, and DOLLINGER CORPORATION, Appellant. (And Three Other Actions.)

Fourth Department, December 21, 1979

## APPEARANCES OF COUNSEL

*Sullivan, Gough, Skipworth, Summers & Smith (McCarthy, Fingar, Donovan, Glatthaar, Drazen & Smith,* by *Henry Smith* of counsel), for Dollinger Corp., appellant.

*Nixon, Hargrave, Devans & Doyle (David M. Lascell* and *William S. Brandt* of counsel), for Rochester Gas and Electric Corporation, respondent.

*Cucci, Welch, Colicchio & Weinstein (Roy Colicchio* of counsel), for Nicholas J. Meleo and others, plaintiffs.

*Brennan, Centner, Palermo & Blauvelt (Anthony R. Palermo, Peter M. Blauvelt* and *Michael E. O'Neil* of counsel), for Fisher Controls Co., respondent.

*Culley, Marks, Corbett, Tanenbaum, Reifsteck & Potter (F. Robert Michel* and *William M. Marks* of counsel), for Rockwell Manufacturing, respondent.

*Lamb, Webster, Walz, Donovan & Sullivan (Francis Donovan* of counsel), for Web Seal, Inc., respondent.

*Johnson, Reif & Mullan, P. C. (Byron Johnson* of counsel), for Nicholas J. Meleo and others, defendants.

## OPINION OF THE COURT

HANCOCK, JR., J.

Four damage actions resulting from an explosion (one for wrongful death, two for serious personal injuries and one for property damage) against several defendants including appellant were ready for joint trial before a jury. The defendants made collective agreements of settlement for various amounts with each of the plaintiffs in the wrongful death and personal injury actions. Because they had been unable to agree among themselves as to their proportionate shares of responsibility for payment of the settlements, defendants stipulated that

their obligations for payment would be determined by their respective liabilities as apportioned by the jury in the property damage case which had not been settled and was proceeding to trial. As jury selection was about to commence, plaintiffs in the property damage action agreed, in return for a specified sum, to release their claims pursuant to section 15-108 of the General Obligations Law[1] against all defendants except appellant, it being understood that plaintiffs' rights to proceed against the nonsettling defendant were preserved. Over appellant's objection, the court granted the settling defendants the right to participate in the trial of plaintiffs' unresolved claims against appellant in the same manner and to the same extent as if the settling defendants were still interested in the action. The court also ruled, again over appellant's objections, that the trial of plaintiffs' unsettled

---

1. Section 15-108 of the General Obligations Law, Release or covenant not to sue, states:

"(a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

"(b) Release of tortfeasor. A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

"(c) Waiver of contribution. A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person."

After a settlement under section 15-108 of the General Obligations Law the released defendants are absolved from any possible liability to plaintiff, to each other, or to the nonsettling defendant. Plaintiff's claim against the nonsettling defendant survives. The nonsettling defendant may defend the case upon the ground that the blame should be placed wholly or partially on the defendants who have settled. He may demand that the jury apportion the recovery between him and the settling defendants.

When plaintiff has obtained a verdict against the nonsettling defendant and there has been an apportionment against the settling defendants, the amount apportioned against the settling defendants is deducted from plaintiff's recovery if it is higher than the amount plaintiff has received from them by way of the settlement. If it is lower than the settlement, the amount of the settlement is deducted from the recovery against the nonsettling defendant. Obviously plaintiff's interests are best served by placing as much liability as possible on the nonsettling defendant. The nonsettling defendant's interests are just the contrary. (See *Mielcarek v Knights,* 50 AD2d 122, 126-128; McLaughlin, Practice Commentary, McKinney's Cons Laws of NY, Book 23A, General Obligations Law, § 15-108, pp 717-719.)

claims would be used as the means to effect the apportionment of the respective obligations of all the defendants (including that of appellant) for payment of the wrongful death and personal injury settlements. Although all of the defendants except appellant had been absolved from any possible liability to plaintiffs, the trial was conducted as if there had been no settlement with any defendant and as a trial in which the jury, who were unaware of the settlement, would presumably expect plaintiffs to press their claims against all defendants.

In the trial, plaintiffs pursued their claim only against appellant. None of the defendants except appellant argued that there should be a no cause for action. Three of the settling defendants contended affirmatively that plaintiffs should recover against appellant and actively and aggressively participated in the trial so as to ensure that result. The jury found appellant solely at fault and exonerated the settling defendants.

The decisive issue is whether appellant was irreparably prejudiced by the court's ruling that the trial should be conducted with the settling defendants participating fully as if the plaintiffs had unresolved claims against them when, in fact, this was not so. Appellant argues that the trial, as the court directed it should be conducted, was inherently and incurably unfair because it was not in the interest of plaintiffs, having settled under section 15-108 of the General Obligations Law, to obtain verdicts against the settling defendants. Plaintiffs' interests were best served by presenting their case against appellant alone. This interest of the plaintiffs, appellant submits, coincided exactly with that of the settling defendants who, though not exposed to liability in the case being tried, would also be best served by placing the blame entirely on appellant because that would absolve them from bearing any part of the obligation to pay the settlements in the personal injury and death cases.

Although mindful of the meticulous handling of this case during trial and the commendable efforts of the court to bring to a final conclusion a complicated and expensive litigation, we nevertheless are constrained to agree with appellant that a trial that could fairly determine appellant's rights and liabilities with the case in this posture was an impossibility. Because we must, for this reason, direct a reversal and a new trial we do not reach the several other issues raised.

Discussion of the basis for our decision requires us to describe generally the lawsuits, the facts, the settlement agreements, the trial and the motions and judgments that followed.

I

On April 16, 1973 at approximately 3:30 in the afternoon natural gas, which had escaped from a leak and accumulated in the basement of Building No. 14 of the Perinton Manor Apartments,[2] exploded. The explosion and resulting fire killed Karen Bloom, seriously injured Jack Hollis, Hazel Hollis and Joann Flewell, destroyed Building No. 14, and caused extensive damage to other buildings of the apartment complex and to personal property of several of the tenants.

Four lawsuits, out of a total of 21 which were commenced, are the subject of this appeal: i.e., the Bloom wrongful death action; the Hollis personal injury action; the Flewell personal injury action; and the Meleo property damage action[3] for damage to Perinton Manor. In the Meleo action, the complaint alleged, *inter alia,* claims based on negligence and strict products liability against the concerns responsible for the manufacture, assembly and installation of the "gas train", i.e., the various pipes, connections and devices located in the gas equipment room of Building No. 14 through which the high pressure gas coming from the outside must pass for delivery at a properly reduced low pressure to be used by the tenants in the several garden apartment structures.

Of the five defendants in the Meleo action, four were manufacturers of components of the gas train: i.e., Dollinger Corporation (Dollinger) which manufactured the filters for the removal of dirt and dust from the incoming gas; Fisher Controls Co., Inc. (Fisher), the manufacturer of the regulator which reduced the high pressure gas to the proper low pres-

---

2. Perinton Manor is a 28-building complex of garden apartments located on Route 31 in the Town of Perinton, Monroe County.

3. The owners of Perinton Manor Apartments were Nicholas J. Meleo, Joseph J. Meleo and Frank Pavia, doing business as Perinton Manor. The owner group, who were plaintiffs in the Perinton Manor property damage action and defendants in the Bloom, Hollis and Flewell actions, will be referred to hereinafter as one party collectively, i.e., as the "Meleos", or the "Meleo" plaintiffs or the "Meleo" defendants. Perinton Manor, Inc., another plaintiff in the Perinton Manor property damage action, withdrew with the consent of all parties. Perinton Manor, Inc. remained as a defendant in the other actions and is included in any reference to the Meleo defendants.

sure for use by the tenants; Rockwell Manufacturing Co. (Rockwell), which made the valve to relieve the excess pressure and the meter to measure the amount of gas used; and Web Seal, Inc. (Web Seal), the fabricator and supplier of the gaskets used in the Dollinger filters. The fifth defendant, Rochester Gas and Electric (RG&E) purchased the various components and assembled and installed the gas train.

The Bloom, Hollis and Flewell complaints named the same five defendants and in addition the owners of the apartment complex (the Meleos). By court order on June 19, 1975 the cases were joined for trial. After the completion of lengthy discovery procedures and numerous pretrial conferences, the court, with agreement of all counsel, directed that the liability phase of the bifurcated trial in the Meleo, Bloom, Hollis and Flewell actions should commence on March 4, 1978.[4]

In was at this stage that the first of the two crucial settlements, which are central to this appeal, took place. By stipulations on March 4 and March 6 with counsel representing Bloom, Hollis and Flewell, the six defendants (i.e., RG&E, Fisher, Rockwell, the Meleos, Web Seal and Dollinger) settled those actions for the aggregate sum of $791,533.[5]

Although they were in accord as to the reasonableness of the amounts of the settlements, the defendants could not agree among themselves as to their proportionate shares of responsibility for payment. Recognizing the possibility that a trial could result in a plaintiffs' verdict that was substantially higher than the settlements, they decided to obviate that risk by collectively making a binding settlement with the plaintiffs with the added proviso that the question of the apportionment of responsibility be held in abeyance for determination by the jury in the Meleo or other property damage action which might come to trial.[6] Two of the defendants, RG&E and

4. The 17 other actions involved property damage claims by tenants, by the Travelers Insurance Company as subrogee, by Rochester Telephone Company, and by RG&E as assignee of the claims of tenants with whom it had settled. These cases are not the subject of this appeal.

5. The Hollis personal injury action was settled on March 4, 1978 for $415,000. On March 6, 1978 the Flewell personal injury claim was settled for $325,000 and the Bloom wrongful death action was settled for $50,000 plus funeral expenses.

6. There are several expressions in the record of the understanding as to the method of determining apportionment. The following excerpts are typical and contain the substance of the stipulation:

By Mr. Brandt, attorney for RG&E: "It is our understanding that defense counsel have agreed to abide by the liability aspects of this case, which will be found by the

Dollinger, it was agreed, would fund the settlement in advance of the apportionment determination by putting up the "front" money with RG&E advancing 80% of the $791,553 and Dollinger 20%.[7]

One of the four cases that had been ordered to trial remained as a pending unsettled lawsuit against RG&E, Dollinger, Fisher, Rockwell and Web Seal—the Meleo property damage case. Accordingly, the attorneys and the court proceeded to confer in an effort to resolve the several legal and procedural problems they foresaw in a trial which all realized could last several weeks and would involve voluminous and highly technical proof.[8]

At that stage of the proceedings it appears from the record that:

1. all parties and the court considered the Bloom, Hollis and

---

jury commencing on Monday, and that everybody is in agreement that whatever the jury finds, and however the jury apportions the liability, those figures will govern certain settlements that have been made with certain of the plaintiffs."

By Mr. Palermo, attorney for Fisher: "On behalf of the defendant Fisher Controls in the Hollis case, I agree to have the fault and the apportionment decided in the Hollis case in accordance with the findings of fault and any apportionment which may take place in any of the other remaining personal injury cases or property damage cases which go to trial. * * * we put on the record with respect to the Hollis action, that is, with the understanding that the question of fault and apportionment, if any, among the various defendants would be determined by a trial on the issues which remain before the Court in the companion cases, primarily the property damage claims of Perinton Manor and the other property damage claims, and apparently also in the case of Bloom, which has not been settled. * * * I agree [with respect to the Bloom case] * * * to be bound by the finding with respect to liability and apportionment as may be determined on subsequent trial of the companion actions."

7. Upon receipt of the releases, full payment was made to the plaintiffs Hollis on March 11, 1978, to the Flewells on March 15, 1978, and in the Bloom death case, on May 2, 1978.

8. For example, counsel expressed concern about the possibility of a no-cause-for-action verdict against the Meleo plaintiffs and the effect of that on the agreement as to apportionment in the death case and personal injury cases that had been settled. The court proposed and counsel agreed to the following procedure: counsel would be given an opportunity to be heard in another summation following which the court would instruct the jury on apportionment of the responsibility of the various defendants. There was also discussion about the use of depositions, and particularly those of the Hollises and Flewells who were no longer parties but witnesses; the time alloted counsel for openings; whether objections which might have been made at the time of the examinations before trial had been reserved until the trial; and various problems pertaining to *voir dire* such as: the asking of the insurance question, what if anything the court should say to the jury before *voir dire,* and the number of and procedures to be followed in connection with alternates.

Flewell actions to be finally settled with the plaintiffs and terminated as independent, subsisting lawsuits;[9] and

2. the contemplated trial of the Meleo action, which the parties had agreed would serve as the vehicle for effectuating their stipulation as to the proportionate responsibility for payment of the Bloom, Hollis, and Flewell settlements, was to be a normal adversarial trial in which the Meleo plaintiffs would seek and might possibly obtain recovery against any one or all of the defendants and in which the plaintiffs expected no co-operation from their adversaries.

During the afternoon of March 8, 1978 the course of the proceedings changed radically. While discussions were still in progress concerning procedures in the forthcoming Meleo trial, the attorney for the Meleo plaintiffs unexpectedly announced that his clients had settled with RG&E, Fisher, Rockwell and Web Seal (all the defendants except Dollinger) for the sum of $450,000. The settlement, which plaintiffs and RG&E, Fisher, Rockwell and Web Seal agreed was made pursuant to section 15-108 of the General Obligations Law, included a reservation of rights by plaintiffs against Dollinger, the nonsettling defendant. The four settling defendants (not Dollinger) and plaintiffs then agreed: "that this trial continue with all defendants named, including the ones we've arrived at this agreement with, so that eventually a jury may arrive at an apportionment of liability such as it might be." They further agreed: "that the attorneys for those parties will continue to participate in the trial of that action which remains for the purpose of having apportionment decided and

---

9. At the conference on March 4, 1978, the court stated: "Of course, that litigation [referring to the Hollis case] will be terminated by the agreement you have heard expressed here." At the March 6, 1978 conference, in response to the question raised by Mr. Johnson, attorney for the Meleo group as defendants, pertaining to the effect of the Bloom settlement of a jury verdict of no cause for action in the Meleo trial, the court stated: "This case [the Bloom case], having been resolved, it becomes academic. This is an undertaking by the defendants to pay her."

It should also be noted that Mr. Palermo, counsel for Fisher, following settlement of the wrongful death case and the personal injury cases, objected to the use of the depositions of Mr. and Mrs. Hollis and Mrs. Flewell inasmuch as those depositions had been taken of deponents as parties to the lawsuits. Mr. Palermo argued that the deponents were not now parties but witnesses and that if he had examined them as witnesses he "might very well have asked a lot of other questions." This position is inconsistent with the position adopted later (after the General Obligations Law, § 15-108 settlement with the Meleos) and raised on this appeal that the Bloom, Hollis and Flewell actions continued in existence for trial "as companion actions along with the Meleo property damage suit."

that *all of the other bodily injury cases and the wrongful death action have been previously settled with plaintiffs also continue as companion actions."* (Emphasis supplied.)

Dollinger, of course, was not a party to any of the stipulations pertaining to the settlement of the Meleo case and, it should be noted, voiced specific objections to the proposed trial of the Meleo action, after four of the defendants had settled with plaintiffs pursuant to section 15-108 of the General Obligations Law, as a purported lawsuit against all defendants as though there had been no settlement. Arguing that the trial after the section 15-108 of the General Obligations Law settlement could not be an adversary trial as between the plaintiffs and the settling defendants because the plaintiffs and those defendants would share the common aim of placing all of the responsibility on Dollinger and because RG&E, Fisher, Rockwell and Web Seal would be merely "fictitious defendants in the case for the purpose of trying to help the plaintiff get a verdict," Dollinger made two motions, both of which were overruled. The motions were:

1. to limit the participation in the Meleo action to the remaining defendant Dollinger and to prohibit the attorneys for the settling defendants from taking part in the trial; and

2. to be relieved from the stipulation made in its agreement to settle the Bloom, Hollis and Flewell cases that its share of the settlement be determined by the apportionment made by the jury in the trial of the Meleo action.

A discussion ensued as to what would happen in the event of a no cause for action against the Meleos in what now would be a trial that would appear to be—but would not really be—a trial of the plaintiffs' claims against all the defendants. Four of the defendants agreed and the court ruled over Dollinger's objection that in the event of a "no-cause" the lawyers would be given a chance to sum up again and the question of apportionment as against all defendants would be submitted to the same jury.[10]

---

**10.** The court's ruling points up the significant difference between having the apportionment determined in a trial where the nonsettling party is the only participating defendant (the usual procedure after one or more codefendants have settled pursuant to section 15-108 of the General Obligations Law; see McLaughlin, Practice Commentary, McKinney's Cons Laws of NY, Book 23A, General Obligations Law, § 15-108, pp 717-719; *Mielcarek v Knights,* 50 AD2d 122, 126-128) and the procedure followed here. If Dollinger had been allowed to defend the Meleo case as the sole defendant, a "no cause" verdict would have been an unequivocal determination of no liability on its part and there could have been no apportionment against it. By

After resolving other procedural questions and over the objection of Dollinger, the Meleo case proceeded to trial. The court had ruled that the jury verdict would determine the remaining liability questions in the Meleo property damage action (i.e., the liability, if any, of Dollinger to the Meleo plaintiffs and the reduction, if any, of the verdict pursuant to section 15-108 of the General Obligations Law, if the jury should determine that the amount to be apportioned against the four settling defendants was in excess of the settlement figure of $450,000) and that the same trial would also serve as the instrument for apportioning the obligations of the six parties to the settlements with Bloom, Hollis and Flewell.[11]

To the jury the case took the typical form of a lawsuit where a damaged plaintiff was suing several parties. Ostensibly the Meleos were seeking recovery for damages to the apartment complex from one or more of the defendants, i.e., from RG&E, Fisher, Rockwell, Dollinger and/or Web Seal. Although four of the five had settled and had no liability to the Meleo plaintiffs, the jury did not know this. Nor did they know of the settlement agreements in the Bloom, Hollis and Flewell cases. Thus they had no idea that their verdict would have a secondary consequence, i.e., the apportioning of the settlements in those cases. Each party opened, examined witnesses and summed up as if each defendant had some potential liability to the plaintiff.

The plaintiff offered evidence in support of its claim against only one defendant—Dollinger.[12]

---

submitting the case to the jury in the form of a purported or fictitious plaintiffs' case against all defendants, Dollinger could attach no such unequivocal meaning to the "no cause" verdict and would be exposed anew to potential liability in the submission of the apportionment question as against all defendants. In making its ruling the court stated: "As the Court has indicated, the Court has an interest in avoiding the necessity of any further litigation here and it is mandatory that the proportionate share of responsibility be determined on this trial." The court had stated earlier in denying Dollinger's motion that counsel for the other defendants be excluded: "The Court rules on that issue that it is essential that the parties be present to participate in the trial to the end that the agreement which has been reached with reference to the personal injury and the death case be resolved. We certainly aren't going to go into another trial to determine proportionate liability."

11. The settlement agreements included the Meleo defendants plus five other defendants, i.e., RG&E, Rockwell, Fisher, Dollinger and Web Seal. Thus it was necessary for the Meleos to be represented on the trial as defendants as well as plaintiffs.

12. The chief contention against Dollinger was that Dollinger had supplied filters with flat gaskets made of BUNA-S, a material that was not suitable for filters that would be used in connection with natural gas under high pressure, i.e., that BUNA-S

In the opening, plaintiffs' attorney made only one reference to a specific allegation of negligence on the part of a defendant—i.e., the installation of faulty gaskets in the Dollinger filter. He stated: "Now, we contend that the primary fault, primary cause of this leakage was the gaskets of the Dollinger filter. And as this filter, or as this gasket started to deteriorate it reached a point where there was break and there was a leakage." Rockwell, Web Seal and the Meleo defendants in their openings assumed the conventional posture of defendants, contending that the proof would show that they were not liable. Their counsel in their openings adopted an attitude of neutrality with respect to Dollinger. Counsel for RG&E and Fisher, however, who from the inception of the trial made no pretense of attempting to defeat recovery by the Meleos, set out to prove that Dollinger alone was to blame for the explosion. In his opening counsel for RG&E stated: "And you will hear from witnesses produced by RG&E that the cause can be traced directly to the Dollinger filters * * * I repeat that it will be RG&E's proof that the cause of this explosion was failure in the Dollinger filters." Fisher's counsel's opening statement was equally pointed. He stated: "And I believe that the testimony will show that it was a significant high pressure leak which could only come from a leak in the high pressure side of this system, which is the filter."

The chief witnesses for the plaintiffs were employees of one of the settling defendants—RG&E—i.e., Joseph J. Hartman, superintendent of RG&E's general maintenance department and a former assistant superintendent of the gas distribution division, and Donald G. Bess, the assistant superintendent of the gas distribution division and former staff engineer in the gas distribution division. The testimony of these witnesses covered more than two thirds of the 1,372 pages of the record devoted to presentation of the plaintiffs' case. Although apparently called as an employee of a hostile party, Mr. Hartman

filters, made of styrene, should not have been used because styrene would react with natural gas and deteriorate thereby allowing the natural gas to escape, and that filters made of BUNA-N or neophrene should have been used.

Meleo's second amended complaint alleges four causes of action against defendants RG&E, Dollinger, Fisher, Rockwell and Web Seal—i.e., negligence, *res ipsa loquitur*, strict liability, and breach of express and implied warranties. It alleges five causes of action against RG&E alone—i.e., breach of express and implied warranties, strict liability, nuisance, fraud and negligence in maintaining, managing, controlling, inspecting and repairing gas mains, gas lines and gas collection, control and distribution centers. Plaintiff adduced no proof in support of these causes of action.

was asked for and freely gave opinion evidence as an expert. His opinion was that the sole cause was the Dollinger filter.[13] The experts called by the plaintiffs, Dr. Kurt Frisch and Dr. Carl Polowczyk, using the extensive technical testimony supplied by Mr. Hartman as background, gave evidence in their direct testimony in support of plaintiffs' claim against Dollinger only. The expert testimony against Dollinger was pointedly re-emphasized in "friendly" cross-examination by counsel for RG&E and Fisher.[14]

On summation, the attorney for the Meleo defendants, who by this time had abandoned the neutral stance assumed in his opening and joined the attack on Dollinger, after making a detailed argument on the facts concluded by stating: "after all it was Dollinger that placed in the stream of commerce the defective component to which the best and most credible evidence points as the proximate cause of the accident which resulted in the damage to these Plaintiffs." The attorneys for Fisher, RG&E and, finally, the plaintiffs followed, repeating and re-emphasizing the same theme—that there was one party to blame: Dollinger.[15] There was no suggestion that the

---

13. As an exmple, Mr. Hartman testified: "Q. And what is your opinion? A. My opinion is, sir, that a gas explosion did occur at Perinton Manor. Based upon all the information that was given to me it was a leak of a great magnitude. And by the process of elimination of the testing that we did of the underground fuel supply, the service lines coming into the building, the underground piping, the fact that there was no street leaks; certain testing that we did on the inlet headers and observations that the leak had occurred on the inlet side, and the only area that we could find where a leak of that magnitude could occur was through the openings where the filter gaskets were missing."

Mr. Bess testified: "Q. What was your opinion as to the source of this gas leak? A. That it would have to have been a leak through the missing filter, missing gasket in the filter in the installation. Q. Which filters are these you are talking about? The Dollinger filters? A. The two Dollinger filters, yes, sir."

14. For example, Fisher's counsel concluded a portion of his cross-examination of Dr. Frisch as follows: "Q. And when you do have the degradation to the extent that you find a loss of some of the properties, including the property of hardness, in other words, it softens, are you affecting its compression set capability? A. Very much so. Q. And are you affecting its ability to return to its original form? A. Yes. Q. And does it weaken the gasket because of this? A. Very much so. In fact it becomes like a putty-like material. Q. And given those conditions, Doctor, do you have an opinion which you can state with reasonable scientific certainty as to the ability of such a compound under such a state to perform as a sealant? * * * Q. Do you have an opinion, Doctor, assuming those facts? And assuming a degradation to the extent that you have a softening? A. It will simply lose then its function for which it was put in originally, namely to act effectively as a sealant."

15. The attorney for Fisher stated: "And obviously it comes as no surprise to you to learn that in my opinion this explosion was caused by a leak of high pressure gas

jury should return a verdict of no cause for action against the plaintiffs. On the contrary, RG&E's counsel baldly stated in his concluding remarks: "And I suggest to you only one thing in closing, that every one of us here want this verdict to be fair, not only to the Plaintiffs, but to each of the Defendants. And I can see no way that it can be fair unless you return *a verdict against the Dollinger Corporation for the entire amount, for the entire damage. I do not think you should do any less."* (Emphasis added.)

The trial resulted in the assessment of liability against one defendant—Dollinger. The jury, returning a verdict in the form of answers to special questions, stated in substance that the sole cause of the accident was the defendant Dollinger's filter, that the negligence of Dollinger and its marketing of a defective filter were the proximate causes of the accident and that the Meleo plaintiffs, RG&E, Fisher, Rockwell, Web Seal and the Meleo defendants were all free from negligence or from responsibility under any other theory. Although the jury found that RG&E had installed a defective filter made by Dollinger, they also specifically found that RG&E had not been negligent in the installation or in the maintenance and inspection of the gas train. Thus RG&E was exonerated. The result of the verdict was a complete victory for the plaintiff and for all defendants except Dollinger.

The damage phase of the trial was not contested. The jury brought in a verdict of $810,000, which the trial court pursuant to section 15-108 of the General Obligations Law reduced by $450,000 (the amount of the Meleo settlement), leaving a net recovery of $360,000. The court granted RG&E's motion for a judgment over against Dollinger for any liability that

---

from the west filter as a result of design defect, as a result of fabricating defect, as a result of lack of quality control, and as a lack of not knowing what went into these two original prototype filters that went into Perinton Manor."

RG&E's counsel said: "My conclusion, after hearing all these witnesses, and looking at all this proof, and I hope trying to be as objective as all those people from RG&E were when they began this investigation on April 16, 1973, is that there is only one defendant in this lawsuit who bears responsibility to the Plaintiffs, and that is the Dollinger Corporation."

The Meleo plaintiffs' attorney stated: "My feelings after—my opinion after having gone through this lawsuit for the period of time of the trial, and having listened to all the lay witnesses and expert witnesses, having participated in deposition for the past some four years, leaves me to advocate the position that I believe it is Dollinger that is the prime responsibility. It is the one that put an instrumentality known as the GP136-200 filter into a stream of commerce under certain conditions which we maintain should not have occurred."

there might be against it in the Meleo case based on the finding that RG&E, although not negligent, had installed a defective Dollinger filter.[16] It awarded RG&E $3,000 as an added allowance pursuant to CPLR 8303 (subd [a], par 2) and costs and disbursements of $400. The court, it will be recalled, had directed that the Meleo verdict would also serve as the basis of the apportionment determination for the payment of the Bloom, Hollis and Flewell settlements. RG&E had advanced $633,242.40 (80%) of the "front money" to fund the $791,553 settlement with Dollinger contributing 20%. For this reason the court granted RG&E separate judgments over against Dollinger in these actions as "cross claims" for the amounts advanced plus interest.[17]

Fisher, Rockwell and Web Seal entered judgments dismissing the complaints as against them in the Meleo action and in the Bloom, Hollis and Flewell actions[18] and granting judgment to each of them against Dollinger for $3,000 as an additional allowance plus $400 in costs and disbursements.

## II

We examine first the effect on the Meleo lawsuit—the case that was tried—of the settlement by four of the defendants under section 15-108 of the General Obligations Law. There can be no doubt that after that settlement RG&E, Fisher, Rockwell and Web Seal were free from any possible liability to plaintiffs, to each other, or to Dollinger. For this reason (had it not been for the unresolved apportionment of the Bloom, Hollis and Flewell settlements) the four settling defendants would have had no interest whatsoever in the outcome of the Meleos' trial against Dollinger or in any apportionment that Dollinger might request under section 15-108 of the General Obligations Law against them in their absence as settling defendants. They were completely protected by their

---

16. It is difficult to understand the basis for this claim over inasmuch as RG&E had obtained a release from the Meleo plaintiffs which would have been a complete bar to any recovery against it.

17. The basis for the judgments over here is not clear. The Bloom, Hollis and Flewell actions had been settled and no actions by plaintiffs Bloom, Hollis and Flewell were pending. There were no plaintiffs' recoveries against RG&E and no basis for recovery on cross claims. RG&E would, of course, have had a contractual right to enforce the stipulation as to the sharing of the $791,553 settlement.

18. Again, it is difficult to determine the basis for the judgments of dismissal inasmuch as there were no outstanding complaints in any of the actions to be dismissed. See n 18, *supra*.

releases in the Meleo action and thus had no reason for participation. As pointed out in *Mielcarek v Knights* (50 AD2d 122, 127), after a settlement under section 15-108 of the General Obligations Law, "the 'true adversary' * * * is not the settling tort-feasor with no monetary interest or substantive liability, but the plaintiff who will seek to prove that the settling tort-feasor was only slightly at fault and that the greatest percentage of fault should be attributed to the nonsettling defendants." *(Mielcarek v Knights, supra,* p 127.)[19]

Thus, because after a settlement under section 15-108 of the General Obligations Law the true adversaries in the trial become the plaintiff and the nonsettling defendant, the presence of the settling defendants for even a limited participation in the trial against the nonsettling defendant would seem to be totally unwarranted. Here, however, the participation of the settling defendants was anything but limited. Permitting the defendants to participate fully made the trial appear to be one against all the defendants when, in truth, it was a lawsuit by the plaintiffs against only one—Dollinger.

The jurors must inevitably have assumed that the plaintiffs and all the "defendants" were adversaries. They would necessarily have expected plaintiffs to put in their strongest case against all the defendants and have concluded, when plaintiffs put in a case only against Dollinger, that there was no evidence to be offered against the others. But Dollinger could not explain the reason. It could not reveal that plaintiffs had settled with four defendants under section 15-108 of the General Obligations Law and that as a result plaintiffs and the settling defendants were not only not adversaries (as they appeared) but were actually allies in pursuing the same end: a verdict against Dollinger. The case (by the ground rules established) had to be presented as something it was not—a case where plaintiffs had extant claims against all five defendants. The very format for the trial as framed by the court pitted Dollinger alone against the combined forces of the plaintiffs and Dollinger's four codefendants. At the same time, it prevented Dollinger from making its strongest argument: that

---

**19.** *Felice v St. Agnes Hosp.* (65 AD2d 388) is not to the contrary. The case did not involve the question of possible further liability to the plaintiff of the doctors who had settled pursuant to section 15-108 of the General Obligations Law. The question was whether the doctors could be examined before trial despite their settlement with plaintiff because there was a possible claim by the codefendant hospital for indemnity against them which would not have been precluded by the terms of section 15-108 of the General Obligations Law. (See, also, *Riviello v Waldron,* 47 NY2d 297, 305-307.)

the plaintiffs and the four settling defendants were not in fact adversaries, as they seemed to be, but were united in their interests against Dollinger. Thus, the jury could not scrutinize the evidence in the light of the true self-interests and interrelationships of the parties. Furthermore, as a result of the court's ruling that the settling defendants would have full participation, the jurors were exposed to openings, examinations, cross-examinations, and summations by separate attorneys representing the Meleos as plaintiffs and as defendants as well as by attorneys for RG&E and Fisher—all of whom were actively and agressively advocating a verdict for the Meleo plaintiffs against Dollinger while appearing, ostensibly at least, to be adversaries to the plaintiffs. With the deck thus stacked, the outcome could not have been in doubt.[20]

Recognizing, perhaps, the difficulty of offering a plausible reason for their continued participation in the Meleo action against Dollinger, defendants contend alternatively that their participation was in a "continuation" of the Bloom, Hollis and Flewell actions.[21] The argument fails. The Bloom, Hollis and

---

20. It is urged that the trial format chosen was the only way to resolve the remaining claim of the Meleos against Dollinger and at the same time apportion the Bloom, Hollis and Flewell settlements among the defendants. To have conducted the Meleo trial against Dollinger alone with apportionment against the other defendants being made in their absence (the normal procedure after a section 15-108 of the General Obligations Law settlement) would not have been acceptable because the trial was to have a dual effect—i.e., possible reduction of the Meleo verdict pursuant to subdivision (a) of section 15-108 of the General Obligations Law and the allocation of the responsibility for payment of the Bloom, Hollis and Flewell settlements (in which all the defendants were interested and entitled to participation). The court was faced with a dilemma. To deprive the settling defendants of participation would have been unfair to them because of their interests in the Bloom, Hollis and Flewell apportionment. To grant them full participation, as was done, was, we hold here, unfair to Dollinger. Without presuming to suggest the best solution, we note that if all parties had agreed to it, the joint trial of the Meleo claim and the Bloom, Hollis and Flewell apportionment question could have been held with full disclosure to the jury of the fact of the section 15-108 of the General Obligations Law settlement in the Meleo case (except for the amount) and with a full explanation by the court of the effect of that settlement under section 15-108 of the General Obligations Law. The existence of the apportionment stipulation in the Bloom, Hollis and Flewell cases would also have been revealed and the presence of counsel for RG&E, Rockwell, Web Seal and Fisher thus explained. The true interests and the relationship of the parties to one another would then have been apparent to the jury.

21. In its brief, defendant-respondent RG&E argues:

"The Hollis, Flewell and Bloom actions may have been resolved between plaintiffs and defendants insofar as the plaintiffs received payment. To argue however that these actions were resolved as between defendants is clearly at variance with the facts.

"It makes little difference whether the joint trial ordered by Justice Conway was a

Flewell cases were settled. Their claims were released. No rights of Bloom, the Hollises or the Flewells were being tried. No attorneys represented them and no proof was submitted. The suggestion that the cases continued for trial is contrary to the well-established rule that "[o]nce made, a settlement agreement terminates the litigation and a new superseding agreement arises which is the measure of each party's obligation to the other *(Yonkers Fur Dressing Co. v. Royal Ins. Co.,* 247 N.Y. 435, 444; *Langlois v. Langlois* [5 AD2d 75])." *(Owens v Lombardi,* 41 AD2d 438, 440.)

We recognize, of course, that the Bloom, Hollis and Flewell actions, at the time of the Meleo trial, still had limited existences as continuing lawsuits in which one or more of the defendants could, by motion or other measure, have sought to enforce as against the other defendants the agreement made (by all the defendants) in those actions concerning apportionment of the settlements (see *Teitelbaum Holdings v Gold,* 48 NY2d 51). It is quite a different matter, however, to attribute an imaginary full-scale existence to the Bloom, Hollis and Flewell actions for the purpose of arguing that those actions, even though the plaintiffs had settled and were no longer parties, had an unseen "presence" as companion lawsuits being tried along with the Meleo action.[22] Teitelbaum does not stand for such proposition.

The settling defendants do not contend directly that in making the agreement among themselves and with Dollinger to apportion their responsibilities for the Bloom, Hollis and Flewell settlements the parties contemplated the hybrid type of trial that took place. At the time of those settlements the *Meleo* case had not been settled. All assumed that it would proceed as a case against all the defendants. It is inconceivable that any of the able and experienced advocates who participated in the agreement to have the settlements apportioned in the Meleo trial could have had in mind anything other than a full adversarial trial where the plaintiff would be

___

joint trial on the issues agreed to be resolved by stipulation, or as a continuation of the Hollis, Flewell and Bloom actions. Under either analysis, the issues which were to be resolved were appropriately resolved by the joint trial."

22. Nor can the participation of the settling defendants in the lawsuit be justified by any claimed continuing existence of cross claims pertaining to the Meleo action. The attorneys for the settling defendants joined in a motion, granted by the court, for dismissal pursuant to section 15-108 of the General Obligations Law of "all cross-claims, counterclaims, and third party claims relating to the property damage claim" of the Meleos.

attempting to recover against all defendants. To argue that Dollinger agreed to an apportionment in the type of trial that was held would be to suggest that Dollinger's counsel made an unbelievably foolhardy bargain. That he clearly did not do so is borne out by his immediate and forcefully stated objections when he first learned of the format of the lawsuit, as contemplated by the court and the settling defendants.

## III

For the reasons stated above:

1. The order and judgment entered by the Meleo plaintiffs against Dollinger on June 12, 1978 should be reversed and a new trial granted.

2. The order and judgment entered by RG&E in the Meleo action on June 12, 1978 granting RG&E judgment on its cross claim against Dollinger based upon the jury's answers in the special verdict to questions 2 (C)(2)(b) and 3 (a), (b), and (c), and granting $3,400 additional allowance and costs and disbursements should be reversed without prejudice to whatever rights RG&E may have in a cross claim notwithstanding its participation in the settlement under section 15-108 of the General Obligations Law.[23]

3. The appeal of RG&E in the Meleo action from the order entered May 8, 1979 denying its motion for judgment over against Dollinger for the amount of RG&E's contribution to the $450,000 settlement under section 15-108 of the General Obligations Law should be dismissed as academic.

4. The order and judgment entered June 12, 1978 by RG&E in the Hollis personal injury action granting judgment against Dollinger on RG&E's cross claim for $332,000, plus interest should be vacated without prejudice to whatever rights RG&E may have against Dollinger arising out of the settlement stipulations made between the Flewell plaintiffs and the defendants on March 4, 1978.

5. The order and judgment entered June 12, 1978 by RG&E in the Flewell personal injury action granting judgment against Dollinger on RG&E's cross claim for $260,000, plus interest should be vacated without prejudice to whatever rights RG&E may have against Dollinger arising out of the

---

23. We have not reached and express no opinion on the question of the merits of RG&E's cross claim against Dollinger for indemnification and recovery of amounts paid by RG&E in settlement of the Meleo action.

settlement stipulations made between the Flewell plaintiffs and the defendants on March 6, 1978.

6. The order and judgment entered June 12, 1978 by RG&E in the Bloom wrongful death action granting judgment against Dollinger on RG&E's cross claim for $41,242.40, plus interest should be vacated without prejudice to whatever rights RG&E may have against Dollinger arising out of the settlement stipulations made between plaintiff Bloom and the defendants on March 6, 1978.

7. The order and judgment entered June 12, 1978 by Fisher in the Meleo, Hollis, Flewell, and Bloom actions granting judgment in favor of Fisher against Dollinger in the amount of $3,400 representing additional allowance and costs and disbursements should be vacated, without prejudice to whatever rights Fisher may have against Dollinger arising out of the settlement stipulations made between the Hollises and defendants on March 4, 1978, Flewells and defendants on March 6, 1978, and Bloom and defendants on March 6, 1978.

8. The order and judgment entered June 12, 1978 by Rockwell in the Meleo, Hollis, Flewell, and Bloom actions granting judgment in favor of Rockwell against Dollinger in the amount of $3,400 representing additional allowance and costs and disbursements should be vacated without prejudice to whatever rights Rockwell may have against Dollinger arising out of the settlement stipulations made between the Hollises and defendants on March 4, 1978, the Flewells and defendants on March 6, 1978, and Bloom and defendants on March 6, 1978.

9. The order and judgment entered June 12, 1978 by Web Seal in the Meleo, Hollis, Flewell, and Bloom actions granting judgment in favor of Web Seal against Dollinger in the amount of $3,400 representing additional allowance and costs and disbursements should be vacated without prejudice to whatever rights Web Seal may have against Dollinger arising out of the settlement stipulations made between the Hollises and defendants on March 4, 1978, the Flewells and defendants on March 6, 1978, and Bloom and defendants on March 6, 1978.

10. The order and judgment entered June 12, 1978 by the Meleo defendants in the Hollis, Flewell, and Bloom actions granting judgment in favor of the Meleos against Dollinger in the amount of $3,400 representing additional allowance and costs and disbursements should be vacated without prejudice

to whatever rights the Meleos may have against Dollinger arising out of the settlement stipulations made between the Hollises and defendants on March 4, 1978, the Flewells and defendant on March 6, 1978, and Bloom and defendants on March 6, 1978.

DILLON, P. J., SCHNEPP and DOERR, JJ., concur.

In Appeal No. 1 judgment unanimously reversed, on the law and facts, with costs to defendant-appellant against all respondents and a new trial granted.

In Appeal No. 2 judgment unanimously reversed, on the law and facts, without prejudice.

In Appeal No. 3 appeal unanimously dismissed as academic.

In Appeal No. 4 judgment unanimously vacated without prejudice.

In Appeal No. 5 judgment unanimously vacated without prejudice.

In Appeal No. 6 judgment unanimously vacated without prejudice.

In Appeal No. 7 appeal unanimously dismissed as academic.

In Appeal No. 8 appeal unanimously dismissed as academic.

In Appeal No. 9 judgment unanimously vacated without prejudice.

In Appeal No. 10 judgment unanimously vacated without prejudice.

In Appeal No. 11 judgment unanimously vacated without prejudice.

In Appeal No. 12 judgment unanimously vacated without prejudice.