**CABLE BELT CONVEYORS, INC. and Paul N. Howard Company, Petitioners,**

v.

**ALUMINA PARTNERS OF JAMAICA, Respondent.**

**No. 86 Civ. 7980 (WCC).**

United States District Court, S.D. New York.

July 21, 1989.

Weil, Gotshal & Manges, New York City, for petitioner Cable Belt Conveyors, Inc.; Kevin P. Hughes, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for petitioner Paul N. Howard Co.; David J. Branson, of counsel.

White & Case, New York City, for respondent Alumina Partners of Jamaica; Jeffrey Barist, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Respondent Alumina Partners of Jamaica ("Alpart") brings this motion asserting that changed circumstances require my intervention in two arbitration proceedings pending before the American Arbitration Association ("AAA"), which I consolidated over a year ago, between petitioners Paul N. Howard Company ("Howard") and Cable Belt Conveyors, Inc. ("Cable Belt") (AAA Case No. 13–110–0452–85) and between Cable Belt and Alpart (AAA Case No. 13–110–0113–86). *See Cable Belt Conveyors Inc. v. Alumina Partners of Jamaica*, 669 F.Supp. 577 (S.D.N.Y.) (consolidating the proceedings), *aff'd*, 857 F.2d 1461 (2d Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987). Specifically, Alpart asks me to (1) enjoin Cable Belt from asserting claims on behalf of Howard; and (2) vacate my order consolidating the proceedings, and enjoin Howard from participating in the arbitration between Alpart and Cable Belt. For the reasons set forth below, Alpart's motion is denied in its entirety.

## BACKGROUND

Under a contract dated March 31, 1981, Cable Belt promised Alpart that it would supply and install a conveyor system to transport bauxite from Alpart's mine to a storage dome at Alpart's plant site in Manchester Plateau, Jamaica (the "Contract"). On April 9, 1982, Howard entered into a subcontract with Cable Belt to, among other things, install and commission the conveyor system (the "Subcontract"). Both contracts required that disputes between the parties be submitted to arbitration.

In June, 1985, Howard demanded arbitration against Cable Belt for claims totaling thirty-three million dollars. Cable Belt responded that the claims were unjustified, and, pursuant to Section 35(d) of the Subcontract,[1] through a separate demand for arbitration served on Alpart on January 23, 1986, claimed over and against Alpart for such portions of Howard's claims that were sustained and for which Alpart was determined to have been responsible.

I consolidated these arbitration proceedings on March 5, 1987, on the grounds that they involved common questions of law and fact and that resolution of the disputes in separate arbitrations could lead to inconsistent findings:

Howard, the subcontractor, has demanded arbitration against Cable Belt to recover damages for the alleged cost of changes, delays and disruptions in the performance of its subcontract with Cable Belt. Cable Belt has denied liability to Howard for its claim as stated but has claimed over and against Alpart for such portions of Howard's claims as may be established as justified. A possible result of this arbitration is a finding that Cable Belt must pay Paul Howard certain damages on claims for which Alpart is deemed ultimately responsible. If the arbitrations are not consolidated, Alpart

---

1. Article 35D of the Subcontract, provides:

Other than Subcontractor's entitlement to an extension of time under Article 22 of Exhibit C, Contractor shall have no liability to Subcontractor in respect of acts, errors, omissions or defaults on the part of Owner or its representative or in respect of acts, errors, omissions or defaults on the part of Contractor in any way attributable to or arising out of such acts, errors, omissions or defaults of Owner or its representatives (including, without limitation, wrongful termination of the Contract), save insofar as Contractor shall recover from Owner compensation or damages in respect of such acts, errors, omissions or defaults and such compensation or damages shall include a sum in respect of any amounts claimed by Subcontractor and notified to Contractor prior to submission of its claim to Owner, and Contractor will in such event include the amount of such claim in its claim against Owner. Payment of such sum by Contractor to Subcontractor shall be in full and final settlement of any liability of Contractor to Subcontractor in respect to Subcontractors's claim or of the circumstances giving rise thereto. Contractor undertakes to use its best endeavors to pursue any claim against Owner arising out of any such acts, errors, omissions or defaults, and Subcontractor undertakes to pay to Contractor a proportion of the costs incurred by Contract in pursuing any such claim equal to the proportion which Subcontractor's claim bears to the total of Contractor's claim.

might not be held ultimately liable on those claims since the arbitrator in Cable Belt's arbitration against Alpart would not be bound by the decision of the arbitrator in Howard's arbitration, and may reach a decision which is inconsistent with the other arbitrator.

669 F.Supp. at 579.

In May, 1988, Cable Belt and Howard entered into an agreement (the "Agreement") to cooperate in the prosecution of their claims against Alpart and divide between them any resulting award or settlement. "[A]s between" Cable Belt and Howard, the Agreement "supersed[d] for all purposes ... the [S]ubcontract." Agreement ¶ 1.[2]

On November 7, 1988, Alpart wrote to the arbitral tribunal arguing that the Agreement had resolved all disputes between Howard and Cable Belt and asked the tribunal to (1) dismiss the claims asserted by Cable Belt against Alpart on the basis of Cable Belt's potential liability to Howard; and (2) dismiss the Howard–Cable Belt arbitration.

After extensive briefing and oral argument, the arbitral tribunal, on December 6, 1988, denied Alpart's requests "in all respects." [3] This motion followed.

## DISCUSSION

Petitioners have raised numerous procedural bars to my reaching the merits of Alpart's motion. Since Alpart's motion is patently meritless, I have decided not to address the more difficult question of whether it is properly before me. In the following discussion, therefore, I have assumed, without deciding that the issues presented may be resolved by the courts.

### I. The Pass–Through Claims

■ Alpart maintains that the Agreement precludes Cable Belt from asserting claims on Howard's behalf. I disagree. Although the Agreement is drafted somewhat awkwardly, it is evident that the par-

---

**2.** The Agreement provides in pertinent part:

1. Consistent with the terms of ... Article 35D of the subcontract Cable Belt and Howard recognise [sic] and agree that Howard's claims against Cable Belt ... are governed by the terms of such Article, and accordingly it is hereby agreed between Cable Belt and Howard that, subject only to the terms hereafter set forth, upon execution of this Agreement by Cable Belt and Howard:

(a) Cable Belt's and Howard's sole source of recovery on their respective claims shall be from any recovery, by award or settlement, against Alpart and shall be divided between them as provided in paragraph 5 of this Agreement;

(b) Except as set forth in paragraph (1)(a) of this Agreement, Cable Belt ... shall be released and forever discharged by Howard from any and all liability to Howard ..., whether or not such liability has been or could have been asserted in the pending proceeding; and

(c) Howard ... shall be released and forever discharged by Cable Belt ... from any and all liability to Cable Belt ..., whether or not such liability has been or could have been asserted in the pending proceeding.

It is the express understanding and intention of Cable Belt and Howard that their respective rights and obligations shall be set forth in this Agreement, which is to be deemed to supersede for all purposes, as between them, the subcontract referred to above.

2. Cable Belt and Howard agree that they will cooperate in good faith in the prosecution of their respective claims in the pending proceeding against Alpart and in the defense of any claims made or to be made in the pending proceeding by Alpart....

....

5. .... Recognizing that the parties are by this Agreement releasing and discharging each other from liability for such claims and counterclaims, which each in good faith believe to be meritorious and valuable, Cable Belt and Howard agree that any moneys collected in satisfaction of any net award rendered against Alpart, or received as the proceeds of any settlement with Alpart, or received from Alpart as an interim award or other interim payment, shall be paid pursuant to the following order of priority: [The agreement lists various priorities]

(d) The balance of such moneys shall be paid as to two-third to Howard and as to one-third to Cable Belt.

**3.** The parties have argued over whether a letter, Respondent's Exhibit 17, sent by the tribunal to the AAA seeking advice concerning its authority to rule on Alpart's requests constitutes a decision of the tribunal. I am persuaded that it was a private inquiry, not a public decision, and should be stricken from the record. Yet I must reject plaintiff's contention that Alpart's counsel acted improperly in seeking a copy of this document. It is clear that disclosure of the letter was due to a clerical error.

ties were attempting to join forces in a suit against the owner and split the proceeds. Contracts of this sort do not extinguish an owner's liability for damages incurred by the subcontractor.

 "It is common practice for a contractor to present claims of its subcontractors in a suit against the other party to a prime contract." *U.S. Industries, Inc. v. Blake Construction Co.*, 671 F.2d 539, 550 (D.C.Cir.1982) (citing *United States v. Blair*, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944)); *accord Ardsley Construction Company, Inc. v. The Port of New York Authority*, 61 A.D.2d 953, 954, 403 N.Y. S.2d 43, 45 (1st Dep't 1978). Yet a prerequisite to the general contractor's right to recover from the owner on the subcontractor's claim, is the general contractor's liability to the subcontractor. *See J.L. Simmons Co. v. United States*, 158 Ct.Cl. 393, 304 F.2d 886, 888 (1962); *Barnard–Curtiss Company v. United States*, 157 Ct.Cl. 103, 301 F.2d 909 (1962) ("In order to recover this amount from [the owner, the general contractor] must first show that it is liable to the subcontractor for the amount."). Thus, if the general contractor releases the subcontractor from liability, the owner's liability to the contractor will be extinguished. *See Severin v. United States*, 99 Ct.Cl. 435 (1943) (where subcontract provided that general contractor could not be held liable for any loss or damage caused by the owner, general contractor could not sue owner on subcontractor's behalf), *cert. denied*, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944). Whether the subcontractor has released the general contractor turns on whether there is an express negation of liability. "[I]f the subcontract is silent on the question of non-liability of the prime contractor then recovery can be had by the prime contractor on behalf of the subcontractor but where the subcontract expressly negates any liability of the prime contractor to the subcontractor then recovery on behalf of the subcontractor cannot be allowed." *Donovan Construction Company v. United States*, 138 Ct.Cl. 97, 149 F.Supp. 898, 900, *cert. denied*, 355 U.S. 826, 78 S.Ct. 34, 2 L.Ed.2d 39 (1957). On the other hand, a liquidating agreement,

under which the general contractor consents "to reimburse its subcontractor for damages it has suffered at the hands of the [owner] but only as and when the former receives payment from the [owner]," will not eliminate the owner's liability. *J.L. Simmons*, 304 F.2d at 889; *accord Lambert Houses Redevelopment v. HRH Equity*, 117 A.D.2d 227, 230–32, 502 N.Y.S.2d 433, 435 (1st Dep't 1986) ("Agreements liquidating the general contractor's liability in such amounts as can be recovered against the party who allegedly caused the injury have been uniformly upheld."); *see generally* Penne, *Legal Remedies of the Government Subcontractor*, 32 S.Cal.L.Rev. 1, 7–12 (1958) (discussing suits by prime contractors on subcontractors' behalf and effect of exculpatory clauses).

An examination of the cases involving conditional releases suggests that Cable Belt is still entitled to assert a claim against Alpart on Howard's behalf. For example, the "Waiver of Lien and Release" in *J.L. Simmons*, which did not exculpate the general contractor, provided in pertinent part:

> [The Subcontractor] waives releases and discharges any and all liens, claim or right of lien ... with the exception of its claim for losses because of engineering errors in design committed by the [Owner]. In the prosecution of any claim which [the General Contractor] shall advance against [the Owner] for losses resulting from such error of design on the part of the [the Owner], there shall be included the claim of the [Subcontractor]. Although [the General Contractor] will attempt to have the claim of the [Subcontractor] separately considered and the amount thereof separately determined, it is recognized that such efforts may not be successful.... If such be the case, the amount of the [Subcontractor's] allowed claim shall be arrived at by determining the proportion which its claim ... bears to the total of all allowed claims....

304 F.2d at 887–88. The court held that this agreement did not eliminate the general contractor's independent liability to reim-

burse the subcontractor for its damages. It explained that a general contractor's right to assert claims on behalf of the subcontractor is not extinguished by a release unless the general contractor has "expressly negated any liability to the subcontractor for the damages sought to be recovered" from the owner. *Id.* at 889. The court concluded:

> We have indicated that plaintiff's liability is not expressly negated in any event. Rather, the releases simply purport to set forth the manner in which plaintiff's liability is *to be extinguished.* Certainly implicit, at least, in these provisions would seem to be a recognition on the part of the parties that plaintiff *is* liable for these claims. Otherwise there would be no reason for the parties to go to the trouble of providing a method for extinguishing a non-existing liability.

*Id.* at 890 (emphasis in original).

Similarly, the court in *Barnard–Curtiss,* held that a "Mutual Waiver" entered into by a general contractor with a subcontractor did not extinguish the owner's liability for claims brought by the general contractor on the subcontractor's behalf. 301 F.2d at 910. The release involved there was similar to the Agreement:

> [The Subcontractors] hereby release, relinquish and forever discharge [the General Contractor] from all claims ... arising from all and every cause whatsoever.
>
> . . . .
>
> It is expressly understood that, as between [the General Contractor and the Subcontractor], the former is prosecuting in behalf of the latter and against the [Owner] a claim for work done by [the Subcontractor]. Any amount which [the General Contractor] receives from the [Owner] with respect to [this] claim is excepted from this release, and [the Gen-

eral Contractor] agrees to forward sums it may collect when received.

*Id.,* 301 F.2d at 926.

Finally, in *Owens–Corning Fiberglas Corporation v. United States,* 190 Ct.Cl. 211, 419 F.2d 439 (1969) the court found that claims brought by a general contractor on a subcontractor's behalf survived the execution of a "General Release" and a stipulation dismissing with prejudice the subcontractor's suit against the general contractor. *Id.* 419 F.2d at 456–57. The release provided:

> [The subcontractors] do fully and forever release and discharge [the General Contractor] from and against all claims ... save and except that it is understood and agreed that there is expressly reserved and excepted from this release any and all claim or claims ... heretofore made by [the Subcontractors] through [the General Contractor] ... now pending ... it being further understood and agreed that [these claims] shall be prosecuted, without bar or prevention or hinderance by reason of or as a consequence of this release, ... and any sums received by [the General Contractor from the Owner] is hereby excepted from this release and when received shall be forwarded and paid over by [the General Contractor to the Subcontractors].

419 F.2d at 456. The court, observing that "the *Severin* cases are inapposite where the prime contractor has been only conditionally absolved, pending the outcome of its claim against the [owner]," 419 F.2d at 457, held that this release was merely conditional. *See also Lambert Houses,* 117 A.D.2d at 229–30, 502 N.Y.S.2d at 434 (general contractor acknowledged the extent of its liability and agreed to pay part of the expenses in prosecuting the indirect claim).[4]

The issue, then, is whether the Agreement constitutes a general release of all

---

**4.** I can find no support for Alpart's assertion that "[a] general contractor's agreement not to present its legitimate defenses to the claims of its subcontractor in exchange for a release from liability can undermine the very foundation of the adversarial process." *See* Respondent's Brief at 50. Many contractors have done just

that in executing liquidating agreements. To the extent Alpart is prejudiced by such teaming-up, it is not the kind of prejudice that warrants voiding the agreement. *Cf. Lambert Houses,* 117 A.D.2d at 234, 502 N.Y.S.2d at 437 (motion to amend pleading).

liability between Howard and Cable Belt or whether it releases all liability except Howard's claims arising out of Alpart's wrongful conduct, which are liquidated to approximately two-thirds of what Cable Belt can recover from Alpart. I am convinced that the Agreement is closer to the provisions in *J.L. Simmons, Barnard–Curtiss, Owens–Corning,* and *Lambert Houses* than it is to the agreement in *Severin.*

Although it is somewhat poorly drafted, the Agreement does not exonerate Cable Belt for the damage which Alpart's conduct allegedly caused Howard. Instead, it limits Cable Belt's liability to approximately two-thirds of what it can recover from Alpart. The document begins by describing the execution of the Contract and the Subcontract, the contents of Article 35D of the Subcontract, and the pending arbitrations. Agreement at 1–3. It then declares the parties' purpose in entering into a new contract: "[T]o reach an amicable resolution of the disputes and claims pending as between themselves and to provide for an orderly method of *liquidating* their respective claims." Agreement at 3 (emphasis added). In paragraph 1(b), "Cable Belt [is] released and forever discharged" by Howard from all liability, "[e]xcept as set forth in paragraph 1(a)." That paragraph preserves "Cable Belt's and Howard's ... respective claims ... against Alpart," and, together with paragraph 5, provides that their claims against each other are to be liquidated to "any recovery, by award or settlement, against Alpart" and divided approximately "as to two-thirds to Howard and as to one-third to Cable Belt," in view of the fact that it would be "difficult to make a precise apportionment between them of any recovery." Agreement ¶¶ 1 & 5. These provisions are to be considered "[c]onsistent with the terms of Exhibit C, Article 35D of the subcontract," which governs "Howard's claims against Cable Belt." Agreement ¶ 1. Finally, in order to maximize Cable Belt's recovery against Alpart, the parties agreed to "cooperate in good faith in the prosecution of their respective claims in the pending proceeding against Alpart." Agreement ¶ 2.

There is really only one phrase in the Agreement that might be construed as a general release. Paragraph 5 "recogni[zes] that the parties are by this Agreement releasing and discharging each other from liability for such claims and counterclaims, which each in good faith believe to be meritorious and valuable." Agreement ¶ 5. I am convinced, however, that this exculpatory language must be read in light of paragraph 1's more limited release. Any other construction would render the major portion of the Agreement meaningless.

Alpart places much emphasis on the last sentence in paragraph 1: "It is the express understanding and intention of Cable Belt and Howard that their respective rights and obligations shall be solely as set forth in this Agreement, which is deemed to supersede for all purposes, as between them, the subcontract referred to above." Agreement ¶ 1. Yet since that same paragraph provides that the Agreement is to be read consistently with Article 35D, I must reject Alpart's contention that this sentence results in a general release. It is clear that Howard and Cable Belt intended to incorporate Article 35D in their new contract.

Alpart fails to provide a rational explanation for why Howard or Cable Belt would suddenly relinquish a thirty-three million dollar claim against Alpart, without getting something from Alpart in return. Respondent's contention that "Howard may have decided that it probably would recover more by obtaining two-thirds of Cable Belt's net recovery on its direct claims," Respondent's Reply Brief at 33 n. 11, is absurd, and its recitation of the consideration which Cable Belt and Howard exchanged, *id.,* merely explains why Howard relinquished the claims against Cable Belt that could not pass through to Alpart. Cable Belt and Howard had nothing to lose by settling all their claims, except for those that pass through to Alpart, and agreeing to divide up any recovery on the latter. Absent any evidence to the contrary, I refuse to hold that these two corporations acted in a totally irrational manner.

In sum, the Agreement did not negate Cable Belt's liability to Howard for damages caused by Alpart. It simply "set forth the manner in which [Cable Belt's] liability is to be extinguished." *J.L. Simmons*, 304 F.2d at 890 (emphasis omitted). "[I]mplicit [in the Agreement is] a recognition on the part of the parties that [Cable Belt] is liable for these claims. Otherwise there would be no reason for the parties to go to the trouble of providing a method for extinguishing a non-existing liability." *Id.* (emphasis omitted). It may be that Cable Belt and Howard failed to use the "magic words" generally employed in liquidating agreements, but construing the Agreement as a general release would be absurd.

## II. *Deconsolidation*

■ Alpart also requests that, in light of the Agreement, I vacate my order consolidating the arbitration proceedings and enjoin Howard from participating in the Cable Belt–Alpart proceedings. Since I am not convinced that continued enforcement of my consolidation order is inequitable, this request is denied.

Rule 60(b), Fed.R.Civ.P., provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: .... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.... The motion shall be made within a reasonable time....

Relief under this provision is appropriate whenever "subsequent events make it no longer equitable that the judgment have prospective application." 7 J. Moore & J.

Lucas, *Moore's Federal Practice* ¶ 60.26[4] at 262 (1987) [hereinafter *Moore's*]. In *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), where the defendant sought relief from a consent decree entered ten years earlier, the Supreme Court declared that a final judgment with ongoing effect "is subject always to adaptation as events may shape the need." *Id.* at 114, 52 S.Ct. at 462. Moreover, the Court has noted that a district court's power to modify its own judgment continues even after appellate review. *See Standard Oil Co. v. United States*, 429 U.S. 17, 18, 97 S.Ct. 31, 31–32, 50 L.Ed.2d 21 (1976). Of course, "[i]f no equitable grounds for relief are established the trial court should deny the motion." *Moore's* ¶ 60.26[4] at 254–55.

I agree with Alpart that the Agreement has, to a large extent, pulled out the foundation supporting my consolidation order. Since the Agreement acknowledges that Cable Belt is liable for the damage to Howard that Alpart caused in the amount of two-thirds of what Cable Belt can recover from Alpart, the risk of inconsistent judgments that I was concerned about when I signed my previous order is no longer present. Yet my inquiry does not end there. Rule 60(b)(5) requires that the movant show that further enforcement of the order would be inequitable.[5] I am not convinced that Alpart has demonstrated that it will be prejudiced by Howard's participation in the Cable Belt–Alpart proceeding.[6]

The crux of Alpart's argument concerning prejudice is that, unless my consolidation order is vacated, Alpart will be faced with "double opposition." *See* Respondent's Brief at 38–42; Respondent's Reply Brief at 41–44. Specifically, respondent complains:

**5.** Alpart's suggestion, that the proper inquiry on this Rule 60(b)(5) motion is whether the Court would have ordered consolidation had the Agreement "been executed *prior* to the Court's order," Respondent's Reply Brief at 40 (emphasis in original), must therefore be rejected.

**6.** Although I find that Alpart has failed to demonstrate prejudice sufficient to warrant vacating

my consolidation order, I do not mean to suggest that I would allow Howard to participate in the proceeding if I were presiding over it. That determination should be made by the arbitral tribunal, not the Court. And the arbitral tribunal is free, if it wishes, to exclude Alpart from the proceeding by dismissing the Howard–Cable Belt arbitration.

[Petitioners are engaging in] a "tag team" approach to litigation through double witness examinations and double and complementary arguments to the tribunal, attempting to have an increased impact on the arbitrators in the hope that the tribunal will award Cable Belt the maximum amount possible on its remaining claims against Alpart. To permit Cable Belt and Howard to double team Alpart in this fashion would be fundamentally unfair—particularly when two of the arbitrators are non-lawyers who, like a jury in a civil case, might be more likely to be taken in by such tactics.

Respondent's Brief at 39. In support of its contention that such interference by a "non-party" is unfair, Alpart cites *Mars Associates v. New York City Educational Construction Fund*, 126 A.D.2d 178, 513 N.Y.S.2d 125 (1st Dep't), *appeal dismissed*, 70 N.Y.2d 747, 519 N.Y.S.2d 1033, 514 N.E.2d 391 (1987), in which the court found:

> [T]he effect of allowing this "sham action" of Martin's to be tried jointly with the [Mars] action, in substance, permitted Mars to have double representation throughout the trial. Thus, Mars and Martin were each allowed to separately participate in the selection of the jury, challenge potential jurors, make opening statements, examine each witness, conduct sham cross-examinations of each other's witnesses, make closing arguments, object to the admissibility of documents presented by the Fund, and otherwise fully participate in the action against the Fund. Needless to say, such double representation, in this jury trial, gave an unfair advantage to Mars and Martin over the Fund, since they were able to, *inter alia*, divide their objections, arguments, examinations of witnesses, etc., in such a way as to have the greatest possible effect on the jury. In other words, Mars, in effect, had two opportunities to prove its position, giving it an unfair advantage over its adversary.

126 A.D.2d at 193, 513 N.Y.S.2d at 134. Respondent also cites, *Meleo v. Rochester Gas & Electric Corp.*, 72 A.D.2d 83, 423 N.Y.S.2d 343 (4th Dep't 1979). In *Meleo*, all but one of the defendants settled with the plaintiff just prior to trial, yet the trial court permitted counsel for each of the defendants to participate fully at trial. The *Meleo* court reversed on the ground that this "stacked deck" had unfairly prejudiced the defendant that had not settled. 72 A.D.2d at 98, 423 N.Y.S.2d at 353.

I agree with petitioners that these cases are inapposite. The claims involved in this case are being considered by an arbitral tribunal, not a jury. Arbitration panels are permitted to hear many things that would prejudice a jury. Moreover, the jury in *Meleo* was unaware of the settlement agreements.[7] As the First Department recently held, an instruction regarding the existence of such an agreement purges the jury of any prejudice. *Lambert Houses*, 117 A.D.2d at 234, 502 N.Y.S.2d at 437 (noting that *Meleo* was decided on the ground that "non-disclosure of the settlement prevented the jury from scrutinizing the evidence in light of the true self-interests and interrelationships of the parties," and holding that there is no prejudice where the jury is fully informed of the existence of the agreement); *accord Meleo*, 72 A.D.2d at 98 n. 20, 423 N.Y.S.2d at 353 n. 20. Since the arbitral tribunal is aware of Cable Belt and Howard's relationship, there is no risk that, absent deconsolidation, the tribunal will be prejudiced against Alpart. Despite respondent's contrary assertion, there is no fundamental principle which demands that "each side [of an arbitration proceeding] be allowed an equal number of players." *See* Respondent's Reply Brief at 43.

Respondent's Rule 60(b)(5) motion is denied. Since equity does not require vacating my consolidation order, Alpart's second request, to enjoin Howard from participating in the Cable Belt–Alpart arbitration proceeding, is also denied.

---

7. Although the *Mars* opinion does not indicate whether the jury was told of the settlement agreement, it is safe to assume that the agreement was not disclosed.

## CONCLUSION

For the reasons stated above, respondent Alpart's motion to (1) enjoin petitioner Cable Belt from asserting claims on behalf of petitioner Howard; and (2) vacate this Court's March 5, 1987 consolidation order and enjoin Howard from participating in the Cable Belt–Alpart proceeding is denied.

SO ORDERED.